LINDA GORE, administratrix,[1] *vs.* ARBELLA MUTUAL
INSURANCE COMPANY.

No. 09-P-56.

Middlesex. December 10, 2009. - August 30, 2010.

Present: KATZMANN, GRAINGER, & FECTEAU, JJ.

*Insurance,* Motor vehicle insurance, Settlement of claim, Unfair act or practice,
Construction of policy. *Consumer Protection Act,* Insurance, Offer of
settlement, Unfair or deceptive act, Damages. *Damages,* Consumer protec-
tion case.

Discussion of the statutory framework prohibiting unfair insurance claim
settlement practices. [523-526]
In a civil action in which the plaintiff alleged that the defendant insurer had
committed unfair insurance practices involving claims arising from an
automobile accident in which its insured injured the plaintiff, the judge did
not err in concluding that the defendant's delay in responding to the
plaintiff's demand letter constituted a failure to make a prompt and equit-
able offer of settlement to the plaintiff, in violation of G. L. c. 176D,
§ 3(9) [526-527], or in concluding that the defendant harmed its insured
not only by its failure to inform him of a demand and settlement offer but
also by its dilatory response to the plaintiff's demand that led her to spurn
the defendant's late tender and seek an excess judgment [527-528]; further,
the judge's rulings constituted an inherent and implicit rejection of the
defendant's claim that the demand letter was an illegitimate attempt to
manufacture a bad faith claim, an allegation that, even if true, did not
excuse the defendant's actions [528-530].
In a civil action alleging that the defendant insurer engaged in unfair claim
settlement practices involving claims arising from an automobile accident
in which its insured injured the plaintiff, a sound basis existed for at least
double damages on the plaintiff's direct claim, where there was ample
evidence in the record to support the judge's finding that the defendant
acted knowingly [530-533]; however, with regard to the plaintiff's as-
signed claim from the insured, the judge erred in concluding that the actual

[1]Of the estate of Angelina Dattilo. The complaint in this case was originally
filed by Dattilo, individually and as assignee of the rights of Anthony Caban.
While the matter was pending in this court, counsel filed a suggestion of
death of Dattilo and moved that Linda Gore, ancillary administratrix of the
plaintiff's estate, be substituted as the plaintiff in this matter. We take notice
of the suggestion of death, and we allow the motion to substitute. We refer to
the original plaintiff, Angelina Dattilo, throughout this opinion.

damages on that claim did not constitute a "judgment" that could be multiplied under G. L. c. 93A [533-536]; further, the judge's award of prejudgment interest on the assigned claim was proper [536-537].

CIVIL ACTION commenced in the Superior Court Department on October 25, 2002.

The case was heard by *Thayer Fremont-Smith*, J.

*John R. Hitt* for the defendant.

*Joseph P. Musacchio* for the plaintiff.

KATZMANN, J. Following a bench trial, a Superior Court judge found that the defendant, Arbella Mutual Insurance Company (Arbella) had committed unfair insurance practices both against the plaintiff, Angelina Dattilo, and its insured, Anthony Caban. The judge awarded Dattilo damages under G. L. c. 93A and G. L. c. 176D, both directly, as a (third-party) claimant, and as an assignee of Caban's rights against Arbella. Arbella now appeals. Dattilo cross-appeals, claiming error in the calculation of damages.

A. *Background.* We recite the facts from the judge's findings and the uncontradicted evidence before him, reserving recitation of certain facts as they become relevant to the issues raised.

1. *The accident and demand for settlement.* On August 30, 1998, while driving in Florida, Dattilo, then approximately seventy-five years old, was seriously injured when her car was struck by a car driven by Caban. Other parties with serious injuries included two passengers in Caban's car. A third passenger had less serious injuries. Caban was insured by Arbella. At the time of the accident, he maintained an insurance policy with liability limits of $20,000 per person and $40,000 per accident. There were thus four injured parties who could make claims on that money.

Soon after the accident, through a family friend, Dattilo retained Florida counsel, Anthony Christian. On September 14, 1998, Attorney Christian wrote to Arbella, informing it that he represented Dattilo and requesting coverage information. An Arbella claim representative responded promptly by requesting a medical records authorization.[2]

---

[2]Attorney Christian never sent an executed medical authorization form to Arbella, and it is not contained in the record. However, the judge found that

During September, Attorney Christian conducted an investigation, including reviewing the police report, a liability report from his private investigator, and Dattilo's physician's operative report detailing her injuries, surgery, and medical bills. Based on his investigation, Attorney Christian determined that Caban was one hundred per cent at fault for the accident and that Dattilo's injuries exceeded the policy limits. On September 28, 1998, Attorney Christian sent a letter (the demand letter) to Arbella detailing Caban's liability for the accident and Dattilo's injuries, enclosing selected medical records and receipts totaling over $25,000, and demanding that Arbella tender the $20,000 policy limits within thirty days, i.e., on or before October 29, 1998. The demand letter provided that, upon tender of the proceeds, Dattilo would release Caban and Arbella from all liability and would agree to indemnify Arbella for any outstanding liens on the proceeds.

By the time the demand letter was sent, Arbella had conducted its own investigation, and liability and damages were reasonably clear. Caban had admitted that he was at fault, and Arbella's investigator had ruled out any contributory negligence on the part of Dattilo. It was also reasonably clear that the damages exceeded by at least $100,000 the per person policy limits.

During the thirty-day period following the demand letter, Arbella made no written response, and each side attempted only intermittently to speak with the other over the phone. On the final day of the thirty-day period, an Arbella adjuster left a call-back voice mail on Attorney Christian's phone, and he attempted twice that day to return the call but only reached the adjuster's voice mail. During this thirty-day period, Arbella did not communicate the demand letter to Caban.

Upon expiration of the thirty-day period, on November 2, 1998, viewing Arbella's lack of response to the demand letter as a rejection of the offer, Attorney Christian, on behalf of Dattilo, filed suit against Caban in Florida.

"Arbella had been provided with detailed medical bills and a doctor's operative report regarding the surgery which Dattilo had undergone for fractured bones as a result of the accident. At trial, plaintiff's failure to provide a medical authorization form was not alleged to have justified Arbella's failure to have attempted to effectuate a prompt settlement within the policy limits, and the Court finds that it was not a justification."

When Arbella belatedly notified Caban on November 10, 1998,[3] that he was exposed in excess of his policy limits, it stated, "[W]e have been presented with a bodily injury claim" but did not mention that a demand letter had been sent to Arbella on September 28, 1998; indeed, Arbella stated that "a formal demand has not been received." Moreover, Arbella did not mention the offer of settlement provided in Dattilo's September letter.

On February 22, 1999, five months after the demand letter had been sent, a different Arbella adjuster responded in writing to the demand letter, advising Attorney Christian that Arbella was then attempting to determine what claims the other injured persons (passengers in Caban's car) might have, in order to attempt to structure a global settlement.

In a letter dated April 21, 1999, seven months after the demand letter had been sent, Arbella offered the $20,000 policy limits to Dattilo without any conditions other than provision of a release. Dattilo rejected the offer after consultation with Attorney Christian, who, in replying to the offer, wrote, inter alia, that the "release of all claims" demanded as a condition of the offer was "rather presumptuous under the circumstances." Around the same time, Arbella settled with one other claimant and determined that the others did not intend to pursue their claims. On April 29, 1999, Arbella sent Caban another notice concerning Dattilo's claim, identical to the notice previously sent on November 10, 1998. See note 3, *supra*.

2. *Settlement with Caban.* On November 6, 2000, in Florida, Dattilo reached a settlement (the settlement agreement) with Caban whereby a stipulated judgment was to be entered against Caban for $450,000.[4] Pursuant to the settlement agreement, Caban assigned to Dattilo his rights against Arbella for unfair settlement practices.

---

[3]The judge's finding that Arbella's first notice to Caban did not occur until April 29, 1999, is clearly erroneous. The November 10, 1998, letter is in the record appendix, and Dattilo's counsel extensively examined an Arbella employee about the November 10 letter at her deposition (the transcript of which is also in the record appendix). However, as the November 10 and April 29 letters are identical, they suffer from the same failings, and the fact that the same inaccurate and incomplete letter was sent earlier to Caban is of no import in our analysis.

[4]Caban did not actually sign the settlement agreement until May 16, 2001.

The parties intended in the settlement agreement to shield Caban from personal liability for the $450,000 damages by including a provision whereby Dattilo agreed not to execute against Caban on the stipulated judgment. Arbella knew of the negotiations related to the settlement agreement and waived in writing any claim against Caban for noncooperation under the policy.

B. *Procedural history.* Although the c. 93A demand letter and response do not appear in the record appendix, materials in the record on appeal indicate that on September 23, 2002, Dattilo sent a c. 93A demand letter to Arbella in the amount of $1.4 million, and Arbella responded with an offer of $23,966.16. On October 25, 2002, Dattilo, individually and as assignee of the rights of Caban, filed suit in Superior Court against Arbella seeking compensatory damages, as well as multiple damages pursuant to c. 93A, arising out of its allegedly unreasonable failure to settle. After a jury-waived trial held in April, 2007, the judge found that Arbella had engaged in "unfair claim settlement practices" under G. L. c. 176D, § 3(9), and G. L. c. 93A by failing to effectuate a prompt and equitable offer of settlement, failing to notify Caban of the settlement offer, and misrepresenting to Caban that a formal demand had not been received.[5] A judgment entered for Dattilo, dated July 26, 2007.

In a corrected judgment dated September 19, 2007, the judge awarded Dattilo $1,007,342.58. The award consisted of (a) $670,000 in compensatory and multiple damages, (b) $313,728.77 for prejudgment interest, (c) $23,194.40 in costs, and (d) $419.41 in interest on the costs from the date of judgment (July 26, 2007) to the date of the corrected judgment.

The judge reached his compensatory and multiple damages figure by adding $430,000 (the amount of the settlement agreement over and above the $20,000 per person policy limits) (the excess judgment or assigned claim damages); plus $200,000 (Dattilo's attorney's fees, doubled); plus $40,000 (the per person policy limit Arbella failed to pay when it did not respond to the

_____

[5]Although the accident occurred in Florida, the parties agreed at trial that the relevant law of Massachusetts and Florida is similar, and that the court should consider G. L. c. 93A and G. L. c. 176D to be controlling.

settlement demand in October, 1998, doubled) (the direct claim damages). The prejudgment interest award of $313,728.77 was calculated based on a single damages amount of $550,000. The judge used this single damages amount because he declined to double the damages on the assigned claim or the prejudgment interest on those damages.

On appeal, Arbella argues principally that the corrected judgment should be reversed because the judge erred in (a) not explicitly considering the reasonableness of Attorney Christian's conduct in sending the demand letter or the fact that Caban was difficult to reach, (b) awarding prejudgment interest on the assigned claim damages, and (c) finding that Arbella acted wilfully and knowingly in its statutory violations, and thus doubling the award of attorney's fees and damages on the direct claim.

Dattilo cross-appeals, arguing that the judge erred by not doubling the damages on the assigned claim, with interest.

*C. Discussion.* 1. *Unfair claim settlement practices.* a. *Statutory framework.* Arbella challenges the judge's finding that it engaged in unfair claim settlement practices. "We will not disturb a judge's findings of fact in a c. 93A claim unless those findings are clearly erroneous." *Clegg* v. *Butler*, 424 Mass. 413, 420 (1997). General Laws c. 93A, § 2(*a*), inserted by St. 1967, c. 813, § 1, makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 9(1) of G. L. c. 93A, as amended through St. 1979, c. 406, § 1, provides a cause of action for "any person whose rights are affected by another person violating the provisions of [G. L. c. 176D, § 3(9)]." General Laws c. 176D, § 3, inserted by St. 1972, c. 543, § 1, bans "unfair or deceptive acts or practices in the business of insurance," which include "unfair claim settlement practice[s]." G. L. c. 176D, § 3(9). "Those claiming injury by virtue of an insurance practice prohibited by G. L. c. 176D, § 3(9)(*f*), may sue under G. L. c. 93A." *Bolden* v. *O'Connor Café of Worcester, Inc.*, 50 Mass. App. Ct. 56, 59 n.8 (2000), and cases cited.

General Laws c. 176D, § 3(9), sets forth the acts and omissions comprising "unfair claim settlement practice[s]" under

§ 3.[6] As pertinent here, c. 176D provides that an insurer will be liable when it "[f]ail[s] to acknowledge and act reasonably promptly upon communications with respect to claims arising

---

[6]General Laws c. 176D, § 3, provides, in pertinent part:

"The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:—

. . .

"(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:

"(*a*) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

"(*b*) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

"(*c*) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

"(*d*) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

"(*e*) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

"(*f*) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

"(*g*) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

"(*h*) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

. . .

"(*l*) Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

"(*m*) Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or

under insurance policies," G. L. c. 176D, § 3(9)(*b*); "[f]ail[s] to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," G. L. c. 176D, § 3(9)(*e*); or "[m]isrepresent[s] pertinent facts or insurance policy provisions relating to coverages at issue," G. L. c. 176D, § 3(9)(*a*). In addition, in circumstances where liability is reasonably clear,[7] the insurance company must act to "effectuate prompt, fair and equitable settlements of claims." G. L. c. 176D, § 3(9)(*f*).

The statute protects the interests of both claimants and insureds against unfair insurance claim settlement practices. With respect to claimants, it was "enacted to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." *Clegg* v. *Butler*, 424 Mass. at 419. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 562 (2001) (purpose of G. L. c. 176D, § 3, is to "remedy a host of possible violations in the insurance industry and to subject insurers committing violations to the remedies available to an injured party under G. L. c. 93A"). General Laws c. 176D, § 3(9)(*f*), in particular, aims to "deal with the conduct of some insurers that stymied those with bona fide claims from obtaining fair settlements in a reasonably prompt time." *Hopkins* v. *Liberty Mut. Ins. Co.*, *supra* at 562.

The statutory scheme also recognizes that encouraging the prompt settlement of claims protects the insured. "The insurer has a duty to its insured. If it does not fulfill that duty, it may violate G. L. c. 176D, § 3(9), and be liable to its insured." *Lazaris* v. *Metropolitan Property & Cas. Ins. Co.*, 428 Mass. 502, 506 (1998). See *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. 115, 120 (1994).

While the insurer has a duty to respond promptly to demands

---

"(*n*) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

[7]Arbella does not challenge the judge's finding that, as of the date of the demand letter, Caban's liability to Dattilo was clear. As noted in the police report, Caban admitted to drinking and smoking marijuana prior to driving, and Arbella's adjuster testified that, as of October, 1998, she believed Caban had been one hundred per cent at fault.

by a claimant and to effectuate prompt settlement, it also has an obligation to protect the interests of its insured, and to guard against bad faith claims. When an insurer unfairly fails to settle, the interests of the injured party and the insured may align. See, e.g., *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 93-95 & n.8 (1983).[8] Compare *Campione* v. *Wilson*, 422 Mass. 185, 192-193 (1996) (assignment of claim against insurance brokers). An injured party may always file suit against the insured tort-feasor and obtain a judgment for damages regardless of the insurance policy limits. If the insurer violated the law in failing to settle for the policy limits, then the insurer will be liable to the insured for the damages exceeding the policy limit. This is based on the insurer's having breached a duty to the insured by causing the claimant to pursue and obtain the excess damages claim against the insured. In such circumstances, it is not uncommon for the insured to settle with the claimant, especially in cases where liability is clear, and then assign to the claimant his or her rights to sue the insurer for the unfair claim settlement practice. See generally *DiMarzo, supra*; *Campione, supra* at 190-191.

b. *Analysis*. In light of these principles, the judge did not err in concluding that Arbella had engaged in unfair settlement practices.

i. *Dattilo*. Arbella waited five months to respond to Attorney Christian's demand letter, only then advising Attorney Christian that it was ascertaining other potential claims by injured passengers in Caban's car; it was seven months before Arbella proposed a settlement. The judge's finding that Arbella violated G. L. c. 176D, § 3(9), by failing to make a prompt and equitable offer of settlement was not clearly erroneous. "An insurer has a duty . . . to respond to settlement offers within policy limits by the deadline prescribed in the offer . . . provided that the time allotted for acceptance is reasonable. What constitutes a reasonable time depends upon the circumstances of the particular case. Whether an insurer has acted in bad faith by failing to settle a claim within the time limits unilaterally imposed

---

[8]*DiMarzo* considered the validity of an assignment of a claim brought pursuant to an earlier version of G. L. c. 93A, § 9. See 389 Mass. at 93 n.7.

by a plaintiff is a question for the finder of fact." 14 Couch, Insurance § 203:15, at 203-25 (3d ed. 2008).

Arbella's experts testified that the thirty-day demand letter presented a reasonable time in which to demand a settlement response. Moreover, even if more time were needed to make a settlement offer, Arbella had an obligation to at least respond and inform the claimant's attorney as to the status of the claim. Although Arbella counters that its delay was occasioned by the logistics of seeking a global settlement with various claimants, that purported reason was not communicated to Attorney Christian or to Dattilo. In any event, even if that issue were a reasonable basis for delay in making a settlement offer, it did not excuse Arbella's failure to respond to the initial demand in a prompt manner. See, e.g., 14 Couch, Insurance § 203:15, *supra* at 203-25 to 203-26 & n.5, citing *Grumbling* v. *Medallion Ins. Co.*, 392 F. Supp. 717, 721 (D. Or. 1975), aff'd, 545 F.2d 686 (9th Cir. 1976) (insurer's failure to respond to time-limited offer with a fifteen-day deadline until fifteen days after the deadline passed amounted to bad faith). Nor do we find persuasive Arbella's claim that Dattilo's failure to provide a medical authorization excused its failure to respond; the judge found that Arbella was in possession of sufficient medical bills to conclude that damages would exceed the policy limits, and had indeed later made a policy-limits offer without requiring medical authorizations. Similarly unavailing is Arbella's contention that its concerns about the need for a Medicare lien release warranted delay. The judge did not err in finding that Arbella failed to communicate this to Dattilo.

ii. *Caban.* Arbella's impermissible delay in responding to the demand letter was compounded by its failure to notify Caban of the settlement offer. Moreover, when Arbella's letter belatedly notified Caban on November 10, 1998[9] (after the expiration of Dattilo's September 28 offer, and after she had filed suit against Caban in Florida on November 2, 1998), that he was exposed to any excess of policy liability, it misinformed him, in violation of G. L. c. 176D, § 3(9)(*a*), that "a formal demand has not been received."[10] See *Peckham* v. *Continental Casualty Ins.*

---

[9]See note 3, *supra.*

[10]We see no reason to disturb the judge's determination that "the letter plainly *was* a formal demand."

*Co.*, 895 F.2d 830, 835, 840 (1st Cir. 1990). See also generally 14 Couch, Insurance § 203:16 (3d ed. 2008). That misrepresentation reinforces the picture of a pattern of bad settlement practice. And where, as here, the insured's liability was clear within days, and damages clearly exceeded the policy limits, Arbella's tactic of delay constituted a violation of its obligation "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" pursuant to G. L. c. 176D § 3(9)(*f*). See *Clegg* v. *Butler*, 424 Mass. at 419; *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass at 562. See also, e.g., 14 Couch, Insurance § 206:28, at 206-44 n.37 (3d ed. 1999), citing *Lozier* v. *Auto Owners Ins. Co.*, 951 F.2d 251 (9th Cir. 1991). In sum, Caban was harmed not just by Arbella's failure to inform him of the demand and settlement offer but also by Arbella's dilatory response to Dattilo's legitimate demand for settlement that predictably led her to spurn Arbella's late tender and seek an excess judgment.[11] Contrast *Doe* v. *Liberty Mut. Ins. Co.*, 423 Mass. 366, 372 (1996) (no prejudice from six-month delay in responding to insured's claim letter where no showing of bad faith and insurer had no duty to defend).

iii. *Claimant's conduct.* Arbella contends the judge committed legal error by failing to consider whether Attorney Christian's motive for sending the September 28 demand letter was to manufacture a bad faith insurance claim. We disagree. This issue was squarely presented during the trial. Attorney Christian testified that he did not have a bad faith claim "in mind" when

---

[11]There is no merit to Arbella's argument that the judge erred by ignoring Caban's conduct in assessing the fairness of Arbella's claim settlement practices. The judge found that Arbella engaged in an unfair claim settlement practice by failing to disclose the settlement offer to Caban. Arbella, in response, points to evidence that Caban was difficult to reach. See, however, *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. at 100 ("Our decisions place the insurer under a duty to take affirmative steps to secure the cooperation of a vanished policyholder"). In any event, other evidence presented at trial showed that Arbella was able to provide information to and receive information from Caban during the relevant time period. Compare *ibid.* & n.16. Furthermore, as we have noted, when Arbella did communicate with Caban regarding his potential liability, it failed to inform him of the demand letter and the offer of settlement. The judge did not clearly err in implicitly concluding that Caban's conduct did not affect Arbella's actions — failing both to respond to the demand letter and to notify Caban of its contents. As to the latter, see, e.g., 14 Couch, Insurance § 203:16 (3d ed. 2008) (duty to inform insured of offers of settlement).

he sent the demand letter or when he filed Dattilo's tort action against Caban on November 2, 1998. He made his demand shortly after the accident to put Dattilo "first in line" to demand coverage before other claimants injured in the accident asserted their demands, potentially exhausting the policy limits. Indeed, Arbella's own expert, Michael Cusack, testified that he "presume[d that] a reasonable lawyer would do [this]" and that he had no "quarrel with" the timing of Attorney Christian's demand. Arbella's claims supervisor, Timothy Horgan, similarly testified that the thirty-day deadline was reasonable. Attorney Christian and Dattilo testified that had Arbella timely tendered the $20,000 policy limits, Dattilo would have accepted it. The judge's ruling — that Attorney Christian's demand warranted a response, that Arbella was obligated under G. L. c. 176D, § 3(9), to respond to the demand, and that Arbella violated § 3(9) by failing to promptly respond — constituted an inherent and implicit rejection of Arbella's claim that the demand letter was an illegitimate attempt to manufacture a bad faith claim.

In any event, we note that Attorney Christian's alleged tactics did not, as a matter of law, relieve Arbella of its duty to respond to a demand when liability was clear and damages exceeded the policy limits. Where liability has become reasonably clear, we have recognized that, consistent with the purpose of G. L. c. 176D, § 3(9), to protect claimants and encourage settlements, "[a]n insurer's statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer." *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567, citing *Metropolitan Property & Cas. Ins. Co.* v. *Choukas*, 47 Mass. App. Ct. 196, 200 (1999), overruled on other grounds by *Murphy* v. *National Union Fire Ins. Co.*, 438 Mass. 529, 533 n.7 (2003).

In *Choukas*, although the insured's liability was "reasonably clear," the insurer failed to tender a settlement offer, defending its failure by pointing out that the claimant's attorney would have rejected it. We held that a claimant's conduct is not relevant to the insurer's duty ("In these circumstances, [the claimant's] attorney's settlement tactics did not relieve [the insurance company] of its statutory duty to attempt to effectuate a prompt, fair settlement of [the] claim and therefore tender an offer to reach that goal"). 47 Mass. App. Ct. at 200.

The cases cited by Arbella from other jurisdictions are not binding and show only that, when liability is unclear, the conduct of a claimant may be considered in assessing whether an insurer engaged in an unfair claim settlement practice by unreasonably delaying settlement.[12]

Here, like in *Choukas*, and unlike the cases cited by Arbella, liability was clear, and the claimant provided sufficient information to determine liability. Furthermore, like the insurer in *Choukas*, Arbella cannot successfully claim that its failure to communicate is excused by the conduct of the claimant's attorney.[13]

In sum, as has been discussed, none of the justifications proffered by Arbella excuses the insurer's failure to promptly respond to Dattilo, or to promptly inform Caban of Dattilo's demand and settlement offer. The judge therefore did not clearly err in finding that Arbella engaged in unfair claim settlement practices.

2. *Damages and interest.* In reviewing the computation of damages and the potential for multiple damages, we note that here there are two claims — a direct claim arising from the wrong done to Dattilo, the tort plaintiff; and an assigned claim that arises from the wrong done to Caban, the insured.

On the direct claim, the judge found that Dattilo directly suffered damages resulting from Arbella's violation of c. 176D in committing an unfair settlement practice, and awarded her

---

[12]See, e.g., *Wade* v. *EMCASCO Ins. Co.*, 483 F.3d 657, 669 (10th Cir. 2007). Compare *Pavia* v. *State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 455-456 (1993). *Miel* v. *State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110-111 (Ct. App. 1995), is inapposite because, unlike in the instant matter, the trial judge there had excluded evidence as to the claimant's motives in setting a short time limit for response to the demand letter.

[13]As has been noted, Attorney Christian's demand letter proposed tender of the $20,000 per person insurance policy limits prior to the delivery of a release. Arbella argues that the judge, in citing *Thaler* v. *American Ins. Co.*, 34 Mass. App. Ct. 639 (1993), erred by concluding that Arbella had improperly delayed because of its unjustified insistence that a release be provided by Dattilo as a prerequisite for settling her demand. As Arbella notes, *Thaler* was overruled by *Lazaris* v. *Metropolitan Property & Cas. Ins. Co.*, 428 Mass. at 504, which held that an insurer does not violate G. L. c. 176D, § 3(9)(*f*), by requiring that a claimant sign a release as a condition to paying the policy limit. The issue is not of consequence here. The record supports the judge's finding that Arbella made no objection to Dattilo's demand letter based on the letter's proposal that a check be issued prior to a signed release, and did not attempt to negotiate a different procedure for exchange of the release and payment.

$20,000 (Caban's policy limit, which was never paid) and the lost interest on that amount from October 25, 2002 (the date the complaint was filed against Arbella), to the date of judgment, July 26, 2007.

On the assigned claim, the judge found that Dattilo's damages as assignee of Caban's rights as an insured consisted of the $450,000 set forth in the Florida stipulated judgment, minus the $20,000 awarded Dattilo under Caban's policy. In making this award, the judge found that the settlement agreement underlying the stipulated judgment was noncollusive and the amount agreed to by Caban in the settlement agreement was "reasonable." The judge also awarded Dattilo prejudgment interest on this amount from October 25, 2002, to July 26, 2007.

Finally, the judge found that Arbella's actions in violation of c. 93A were "wilfully reckless, and, in that sense, intentional." Accordingly, the judge doubled the damages and interest on the direct claim and awarded Dattilo double her legal fees and expenses. However, citing *Clegg* v. *Butler*, 424 Mass. at 424, the judge declined to double the damages on the assigned claim, concluding that the stipulated judgment did not constitute a "decision by a court" and thus could not form the basis for multiplication of damages pursuant to c. 93A.

On appeal, Arbella argues that the judge erred in finding that its actions were wilful and reckless and in awarding prejudgment interest on the assigned claim damages. In her cross appeal, Dattilo argues that the damages on the assigned claim should have been doubled.

a. *Multiplication of damages.* i. *Wilful and knowing.* General Laws c. 93A, § 9(3), provides, inter alia, that damages awarded thereunder shall be doubled or tripled upon a finding that the c. 93A violation was "willful or knowing." In the instant matter, the judge, citing *Kattar* v. *Demoulas*, 433 Mass. 1, 16 (2000), found that on both claims, "while probably not malicious, Arbella's failure to settle when liability and damages were reasonably clear and failure to . . . respond to [Attorney] Christian's demand for a number of months, constituted more than mere negligence, but were wilfully reckless, and in that sense, intentional." The judge thus doubled Dattilo's attorney's fees through trial and the damages and interest on the $20,000

direct claim (the per person limit in Caban's insurance policy that, as we have noted, was never paid).

Arbella asserts that the facts do not establish "recklessness" and argues that the judge's reliance on *Kattar* was misplaced.[14],[15] We conclude that regardless of whether Arbella's conduct is characterized as "reckless," the facts were sufficient to support a finding that Arbella "knowingly" engaged in unfair or deceptive conduct. An insurer knowingly violates c. 93A and c. 176D when liability is reasonably clear yet it still fails to settle within a reasonable time. See *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 756 (1996) (affirming a finding that the insurer knowingly violated c. 93A where the insurer "had reason to know of its liability for [the claimant's] claim under its insurance policy with [the insured] several months prior to its receipt of [the claimant's] G. L. c. 93A demand letter, yet it failed to settle [the claimant's] claim or tender its policy at that time or for more than a year thereafter").

A person " 'acts knowingly' with respect to a result if 'he is aware that it is practically certain that his conduct will cause such a result.' " *Computer Sys. Engr., Inc.* v. *Qantel Corp.*, 571 F. Supp. 1365, 1374 (D. Mass. 1983), quoting from ALI Model Penal Code § 202(b) (1962). "A judge need not make an *express* finding that a person wilfully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either." *Service Publications, Inc.* v. *Governman*, 396 Mass. 567, 578 n.13 (1986) (emphasis in original).

There is ample evidence in the record to support the finding that Arbella acted knowingly. The record shows, and it is uncontested, that Arbella knew that liability was reasonably

---

[14]In *Kattar* v. *Demoulas*, 433 Mass. at 16, the Supreme Judicial Court held that "a finding of 'wilful' conduct within the meaning of c. 93A is satisfied where the defendant has acted recklessly." See *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. 805, 812-813 (1996) ("decisions construing the multiple damages provisions of G. L. c. 93A . . . have imposed such damages for 'wilful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts").

[15]As to the doubling of the damages on the direct claim, Arbella does not argue in the alternative that, even if its violation of c. 93A was wilful and knowing, only the interest on the $20,000 could be doubled by the trial judge. See and compare *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. 683, 686 (1998); *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 756 (1996). The argument is therefore waived, and we need not address it.

certain by the time it received the demand letter from Attorney Christian. What is more, Arbella knew that the delay in making a prompt and reasonable settlement offer, let alone the failure to even make contact with Attorney Christian for five months, would have subjected its insured, Caban, to a possible excess judgment. Because the record is clear that Arbella knowingly acted in an unfair and deceptive manner amounting to a wilful and knowing violation of c. 93A, there was a sound basis for at least double damages. See *Kattar* v. *Demoulas*, 433 Mass. at 15-16, and cases cited; *Auto Shine Car Wash Sys., Inc.* v. *Nice 'N Clean Car Wash, Inc.*, 58 Mass. App. Ct. 685, 690 (2003) (imposition of multiple damages under c. 93A subject to review for abuse of discretion).

ii. *Assigned claim.* In her cross appeal, Dattilo argues that, pursuant to G. L. c. 93A, § 9(3), the $430,000 damages award on the assigned claim should have been doubled.[16]

General Laws c. 93A, § 9(3), inserted by St. 1969, c. 690, states in pertinent part:

> "[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of . . . section two [of c. 93A] . . . ."

In 1989, the Legislature added the following sentence to § 9(3):

> "For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim."

See St. 1989, c. 580, § 1.

Pointing to the 1989 amendment to G. L. c. 93A, § 9(3), the

_____

[16]Although Arbella argued that the judge erred in finding that it had engaged in unfair claim settlement practices (see our discussion in part C.1.b., *supra*), it makes no argument that the *amount* of the award on the assigned claim — $430,000 in single damages — was error.

trial judge ruled on the assigned claim that those damages were not subject to multiplication, as the settlement agreement did not constitute a "judgment" under G. L. c. 93A, § 9(3). He specifically quoted *Clegg* v. *Butler, supra,* for the proposition that, "[w]hen a case has been settled outside the courtroom, there is no 'judgment' on which to base the multiple damage calculus. . . . [T]he term 'judgment' . . . is founded on a decision by a court, not an award of an arbitrator." 424 Mass. at 424-425, quoting from *Bonofiglio* v. *Commercial Union Ins. Co.,* 411 Mass. 31, 37 (1991), *S.C.,* 412 Mass. 612 (1992) (internal quotation marks omitted). The judge concluded that, in this case, "there was no trial and no 'decision by a court,' but only a stipulated judgment entered by the court pursuant to a settlement." Dattilo argues that the judge erred in concluding that the damages on the assigned claim did not constitute a judgment that could be multiplied under c. 93A. We agree.

Informing our conclusion is the Supreme Judicial Court's opinion in *Drywall Sys., Inc.* v. *ZVI Constr. Co.,* 435 Mass. 664 (2002), where the court interpreted G. L. c. 93A, § 11, as amended by St. 1989, c. 580, § 2, noting that "[t]he same provision was added to G. L. c. 93A, § 9(3)[, by] St. 1989, c. 580, § 1." *Id.* at 668 n.3. There, the court rejected the argument that because an arbitration award is not a "judgment," it is thus excluded from multiplication. Rather, the court permitted an arbitration panel to multiply the actual damages suffered by the plaintiff, distinguishing *Bonofiglio* v. *Commercial Union Ins. Co., supra,* and *Clegg* v. *Butler, supra.* The court explained that "the central holding in [those cases] was that, where multiple damages are sought under G. L. c. 93A based on 'claims arising out of the same and underlying transaction,' those claims must be determined in the same proceeding with the multiple damages claims."[17] 435 Mass. at 668. Furthermore, the court observed that "[t]he use of the word 'judgment' in § 11 is merely contextual, referring to all damages that, in the aggregate, may be multiplied by a court for

---

[17]Compare *Murphy* v. *National Union Fire Ins. Co.,* 438 Mass. at 532 & n.6 (following *Bonofiglio, supra,* and *Clegg, supra,* in declining to allow court in separate c. 93A trial to multiply damages awarded in underlying arbitration, but acknowledging that if the c. 93A claim itself had been submitted to arbitration, the arbitrator could have awarded multiple damages pursuant to *Drywall, supra*).

a wilful or knowing violation of § 11." *Id.* at 669. Here, Dattilo's assigned claim, which the judge properly determined to be reasonable and noncollusive, was "determined in the same proceeding with the multiple damages claim."[18] *Id.* at 668. As such, they are "claims arising out of the same and underlying transaction or occurrence." G. L. c. 93A, § 9(3). Therefore, like the actual damages in *Drywall Sys., Inc.* v. *ZVI Constr. Co., supra,* the actual damages on the assigned claim are subject to multiplication.[19,20]

---

[18]As to the assigned claim, in order to justify the amount of the settlement and recover the excess damages from Arbella as assignee of Caban's claim against Arbella, Dattilo was required to establish the reasonableness of the settlement amount. See 2 Windt on Insurance Claims and Disputes § 6:29 (5th ed. 2007). See also *Glenn* v. *Fleming,* 247 Kan. 296, 318 (1990), and *Griggs* v. *Bertram,* 88 N.J. 347, 368 (1982), cited with approval in *Campione* v. *Wilson,* 422 Mass. at 193. Thus, Dattilo was required to come forward with evidence of her likelihood of success on the merits of her claim against Caban and the likely verdict range should she recover against him. Dattilo was also required to demonstrate that the judgment against Caban was a foreseeable consequence of Arbella's unfair claims settlement practice.

Dattilo carried her burden at trial, putting on medical evidence, the police report from the accident, and testimony from the attorneys who represented the parties during the settlement negotiations about their investigations and conclusions about the case. Caban's attorney testified that after reviewing the medical records, deposition transcripts, accident report, and police report, he concluded that "unfortunately my client was going to be 100 percent responsible for this accident." He based this conclusion on the fact that Caban "[w]ent through a stop sign, did not have the right of way, and he had pled guilty to a DUI. And he admitted to all of this in his deposition." Caban's attorney further testified that Dattilo's medical bills were approximately $50,000, that she was hospitalized for over three weeks, and that she needed twenty-four hour care. Thus, here, the c. 93A trial, like the arbitration proceeding in *Drywall, supra,* provided a single proceeding in which to determine both the underlying assigned claim and any multiple damages on that claim. Cf. *Campione, supra* at 193 (to prevail at trial on assigned claim, plaintiff would have to establish both facts concerning the assigned claim, as well as those in the underlying case). (We note that, while *Campione,* like our case, involved the pretrial assignment of a tortfeasor's claim to the tort plaintiff, unlike the instant matter, in which the assignment concerned an insured's claim against his insurer for breach of its duty to settle claims fairly, see 2 Windt, *supra* at § 6:29, in *Campione, supra* at 193, the assigned claim discussed was for negligence against a noninsurer, the assignor's insurance broker. Accordingly, the nature of the required proof was different.)

[19]While the judge found otherwise, we would note that, given its ordinary meaning, it may be that the entry of the settlement agreement as a judgment on a Florida court docket constituted a "judgment." See *Cunningham* v. *Standard Guar. Ins. Co.,* 630 So. 2d 179, 182 (Fla. 1994) (stipulation functional equivalent of an excess judgment). See also *Thibbitts* v. *Crowley,* 405 Mass.

Accordingly, the matter must be remanded for a determination of multiple damages on the assigned claim.[21]

b. *Prejudgment interest on assigned claim.* Pursuant to G. L. c. 231, § 6B, the judge awarded prejudgment interest on the $430,000 assigned claim damages from October 25, 2002, until the date of judgment, July 26, 2007. Arbella argues that the judge erred by making this award. We disagree.

"Interpretation of a statute is a question of law, which we review de novo." *Devine* v. *Board of Health of Westport*, 66 Mass. App. Ct. 128, 131 (2006), citing *Protective Life Ins. Co.*

---

222, 226 (1989) ("A consent judgment is essentially a settlement agreement that is entered as a judgment"); *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. at 37-38, citing Mass.R.Civ.P. 54(a), 365 Mass. 820 (1974) (defining "judgment" and "final judgment"). However, whether the Florida settlement agreement is characterized as a judgment is not determinative for purposes of the c. 93A action. Rather, as we have noted (see note 18, *supra*), what is material is that the judge here made a determination of the reasonableness of Dattilo's damages on the assigned claim that was separate and apart from the settlement agreement.

[20]The matter before us is distinguishable from *Clegg* v. *Butler, supra*, where the Supreme Judicial Court declined to multiply damages that had been determined based on a pretrial settlement. There, there was no assigned claim, as the insured tortfeasor and the injured plaintiff reached a settlement, and significantly, unlike in our case, the insurer paid the policy limits on the eve of trial. In declining to multiply the damages award, the *Clegg* court observed, "The multiple damages provided under c. 93A are punitive damages intended to penalize insurers who unreasonably and unfairly force claimants into litigation by wrongfully withholding insurance proceeds. As part of the statutory scheme meant to encourage out-of-court resolutions, the statute does not punish settling insurers by placing the entire settlement award at risk of multiplication." 424 Mass. at 425. Here, in contrast, the insurer paid neither the policy limits nor any excess judgment prior to the trial on the assigned claim. Therefore, our decision today is consistent with the court's rationale in *Clegg*.

[21]Because we have concluded that the trial judge did not err in determining that Arbella's violations of c. 93A were knowing and wilful (see our discussion in part C.2.a.i., *supra*), the damages on the assigned claim must be multiplied. The only question to be determined on remand will be whether the damages on the assigned claim should be doubled or tripled. See c. 93A, § 9(3). See generally *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. at 686, quoting from *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. 650, 655-656 (1997) ("[T]here is a distinction in c. 93A 'between violations that consist of unfair or deceptive acts or practices, simpliciter, and those that are knowing or wilful or actuated by bad faith. The former are sanctioned by compensatory "single" damages. Damages for the latter more serious violations are avowedly punitive — and can be very heavily so when the [1989] amendment [to c. 93A] applies' ").

v. *Sullivan,* 425 Mass. 615, 618 (1997). General Laws c. 231, § 6B, provides that the clerk of the court shall add interest to damages from the date of the complaint to the date of judgment.[22] The purpose of prejudgment interest is "to compensate a damaged party for the loss of use or the unlawful detention of money." *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. 704, 717 (1990), quoting from *Conway* v. *Electro Switch Corp.,* 402 Mass. 385, 390 (1988). See *Bernier* v. *Boston Edison Co.,* 380 Mass. 372, 388 (1980); *Salvi* v. *Suffolk County Sheriff's Dept.,* 67 Mass. App. Ct. 596, 609 (2006).

Arbella argues that Caban (in whose shoes Dattilo stands as assignee) suffered no "loss of use" of the assigned claim damages award for purposes of c. 231, § 6B, because he was shielded from personal liability pursuant to the settlement agreement. That argument ignores the import of the assignment of the claim. We have noted our agreement with the trial judge's finding that Arbella violated Caban's rights and subjected him to the $430,000 in excess judgment damages. If Caban had filed the complaint against Arbella, instead of assigning his bad faith claims to Dattilo, Caban would be entitled to prejudgment interest on the excess judgment damages. Dattilo's entitlement to prejudgment interest on the full amount of the damages flows directly from the valid assignment of claims from Caban. It is thus clear, in light of the trial judge's proper determination that the $430,000 settlement agreement between Dattillo and Caban was reasonable and noncollusive, that the award of prejudgment interest was also proper. See, e.g., *Salvi* v. *Suffolk County Sheriff's Dept., supra.* We therefore find no error in the judge's award of prejudgment interest on the assigned claim damages from October 25, 2002, until the date of judgment, July 26, 2007.[23]

---

[22]General Laws c. 231, § 6B, as amended through St. 1982, c. 183, § 2, provides, in full:

"In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law."

[23]Furthermore, we note the judge's correct conclusion, not challenged by

D. *Conclusion.* For the foregoing reasons, the matter is remanded for modification of the corrected judgment by doubling or tripling of the $430,000 excess judgment award pursuant to c. 93A, in accordance with this opinion. In all other respects, the corrected judgment is affirmed.[24]

*So ordered.*

either party, that the prejudgment interest calculation is properly based solely on the "compensatory component" of the award, and not on any multiple damages. See *City Coal Co. of Springfield, Inc.* v. *Noonan,* 434 Mass. 709, 716 (2001).

[24]Dattilo's request for appellate attorney's fees is allowed, and that of Arbella is denied. See *Bonofiglio* v. *Commercial Union Ins. Co.,* 412 Mass. at 613-614; *Kapp* v. *Arbella Mut. Ins. Co.,* 426 Mass. at 687-688. Dattilo may file a motion for appellate attorney's fees and costs within fourteen days of the date of the rescript in accordance with *Fabre* v. *Walton,* 441 Mass. 9, 10-11 (2004). Arbella may file its opposition no later than ten days thereafter.