Botsford, J.
This case has had three separate phases, each of which has been tried. This phase concerns Chapter 93A claims of the plaintiff, Kristi’s Restaurant Group, Inc. (Kristi’s), and it was tried before me on November 19,1999.[2] My findings of fact are set out first, followed by a discussion of legal issues. I conclude that Kristi’s has proved that the defendant, David Zussman, trustee of the Union Realty Trust (Zussman) violated G.L.c. 93A, §§2 and 11, as set forth in Counts V and VI of the third amended complaint, and is entitled to recover reasonable associated attorneys fees and costs from Zussman.
Findings of Fact[3]
The relationship between Kristi’s and Zussman has been anything but amicable. Although the April 13, 1995 lease agreement (April 13 agreement) was supposed to have resolved all the simmering disputes between tenant and landlord, paving the way for a new beginning, within a few days after the agreement was signed, Zussman accused Kristi’s of violating the agreement by placing a second walk-in refrigerator in the rear of the restaurant and constructing a shed-like structure over both refrigerator units. The battle lines were drawn once again.
The April 13 agreement provided that on April 14, 1995, Kristi’s was to pay Zussman the $13,983.86 which Kristi’s had earlier withheld in rent payments, and Zussman was to dismiss the pending summary process action on the same date. On April 14, Kristi’s paid the prescribed amount to Zussman. Zussman did not dismiss the summary process case.
As set out in the memorandum of decision dated April 28, 1999, by May of 1995, Zussman took the position that the April 13 agreement was void on account of Kristi’s purported violations.[4] Zussman, however, did not return the $13,983.86 which Kristi’s had paid pursuant to the agreement’s terms. In addition, when Kristi’s paid its monthly rent for May 1995 to Zussman in the higher amount called for by the April 13 agreement — $9,000.00 in base rent[5] — Zuss-man did not return the check. Rather, the check was retained and deposited, although Zussman’s bookkeeper wrote Kristi’s that Zussman was accepting the check solely “for use and occupation,” without waiver of any rights.
For a good number of years, Kristi’s disposed of its trash in a dumpster which was placed near the restaurant premises on property which abutted Zussman’s property. In late May 1996, a property manager employed by Zussman wrote Kristi’s, demanded the removal of the dumpster, .and offered Kristi’s the option of using Zussman’s trash compactor dumpster; the offer was that Kristi’s would pay for the use of this dumpster by paying Zussman the additional cost he would incur for the extra trash pickups necessitated by Kristi’s use. The offer was accepted. Since July 1996, Kristi’s has paid Zussman $627.50 per month to use his compactor dumpster. Kristi’s asserts that this monthly charge represents more than the additional cost to Zussman- — -claimed to be $455.43 per month — but I am not persuaded by a preponderance of the evidence that this is so. It is possible that at least presently (and perhaps for some time), the cost of adding Kristi’s to Zussman’s compactor exceeds $455.43 per month.[6]
This lawsuit was commenced in 1996. On March 14, 1997, the attorney for Kristi’s took Zussman’s deposition. That afternoon, Zussman stormed into the Kristi’s restaurant premises, indicated that he had just returned from a long deposition with Steven Ross, that he was extremely angry, that there was no way Kristi’s would ever get a lease past its current lease, that he was revoking Kristi’s parking privileges,[7] and that Kristi’s was among the worst tenants he had ever had.
Zussman did as he said he would do.[8] Since March 14, 1997, Kristi’s managers have not been allowed to park in the alleyway, although managers of other restaurants located on the Union Street property owned by the Union Realty Trust are still permitted to do so. There was no evidence introduced on the question what financial loss, if any, Kristi’s has suffered as a result of the revocation of the parking privileges for its managers.
The 1977 lease and the 1988 agreement both contained provisions dealing with the right of Kristi’s, as *298 lessee, to erect signs for its restaurant. Specifically, ¶28 of the 1977 lease states that
Lessee shall have the right to affix and/or erect, at its sole expense, additional signs advertising its operation at those places adjacent to existing passageways where similar such signs are now located, the foregoing subject only to Lessor’s reasonable approval (which shall not be unreasonably withheld or delayed).
Paragraph 4 of the 1988 agreement in turn provides:
With respect to Section 28 of the [1977] Lease, it is understood and agreed by Lessor that Kristi’s will be replacing the current “Backyard” signs and “Backyard” canopy with “Union Street” signs and “Union Street” canopy, and to the extent such signs are permitted by City rules and regulations, Lessor hereby approves of the same.
The parties’ April 13 agreement also deals with Kristi’s right to have a sign:
Tenant [Kristi’s] allowed to affix permanent sign as proposed on plan previously submitted to Landlord [Zussman] . . . Until such time as Tenant affixes said sign, Tenant shall be permitted to affix a sidewalk sign in same location as previous sidewalk sign existed. In addition, “sign” language same as present Lease.
(April 13 agreement, ¶4.)
In April 1995 when the parties executed the April 13 agreement (and for a substantial period of time before that date), Kristi’s had a sign located at the entrance of an alleyway or driveway which runs off Union Street and on which the restaurant is located. The sign was a two-sided “sandwich board” structure which stood on the ground and was chained to a concrete post located on property owned by Union Realty Trust but not part of Kristi’s leased premises. The sign had Kristi’s luncheon menu printed on one side, and the dinner menu printed on the other. The sign served to advertise Kristi’s restaurant and more fundamentally to inform those passing by that the restaurant exists because the restaurant cannot be seen from the street.[9]
On March 24, 1997, ten days after the Zussman deposition and revocation of parking privileges, Adam Dinkes, a property manager employed by Zussman, sent a letter to Kristi’s manager stating:
I am writing this letter to notify you of our recession (sic.) of any permission for the placement of the “sandwich board” sign at the entrance to the driveway to Union Street.
Failure to remove the “sandwich board” sign within 24 hours will cause us to place it in storage.[10]
On April 2, 1997, without notifying Kristi’s, employees of Zussman’s cut the chain and removed the sandwich board sign. At the time of trial the sign had not been restored to its location at the entrance of the alley but was still in the possession of Zussman. I find that the removal of Kristi’s sign, as well as the withdrawal of parking privileges, were acts which Zussman took primarily to retaliate against Kristi’s and its president Steven Ross on account of the April 13 agreement and this litigation.[11]
The sandwich board sign cost Kristi’s approximately 8500.00 to have constructed. Its absence has also cost Kristi’s customers, and thereby revenues, but the evidence does not provide a basis on which to quantify the loss.
The April 13 agreement provides that Kristi’s is to pay $9,000.00 per month in base rent for the first three years of that lease agreement (May 1, 1995 through April 30, 1998); $10,000.00 per month for years four through six (May 1, 1998 through April 30, 2001); and $11.000.00 per month for years seven through twelve (May 1, 2001 through April 30, 2007). The April 13 agreement also provides Kristi’s with an additional ten-year lease option, until April 30, 2017; the 1988 lease agreement ended the lease in 2007. For the 2007-2017 option period set out in the April 13 agreement, the rent is to be set at fair market value. As indicated previously, Kristi’s paid Zuss-man the $9,000.00 in monthly rent pursuant to the April 13 agreement for May of 1995, and Zussman retained the check. Thereafter, until June of 1997, Kristi’s paid Zussman the monthly rent called for in the 1988 agreement, or $7,900.00, but in June, Kristi’s resumed paying rent pursuant to the April 13 agreement.[12]
On June 16, 1997, Zussman caused a notice to quit to be served on Kristi’s for non-payment of rent. The notice states that the rent owed by Kristi’s for June 1997 was $15,000.00, and Kristi’s only paid $10,432.21[13] for the month. Zussman sent a similar notice to quit to Kristi’s dated July 17, 1997,[14] which states that Kristi’s underpaid the rent for both June and July 1997 by paying $10,432.21 each month rather than $15,000.00. The notices to quit do not indicate the source of $15,000.00 as the monthly rental amount. It appears that this is an amount which Zussman purported to have established, unilaterally, for under the ten-year lease extension period which is provided for in the 1988 agreement.[15] Zussman did not pursue either of these notices to quit.
Discussion
At issue in this case is the relationship between a commercial landlord and his business tenant. While “the [not overly precious] standard of the commercial marketplace” (Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1986)) governs here, nonetheless, I conclude that Zussman’s pattern of conduct towards Kristi’s since April 13, 1995 establishes that he has violated G.L.c. 93A, §11.
Kristi’s and Zussman entered into the April 13 lease agreement, and within the month, Zussman was taking the position with Kristi’s that the agreement was void. Kristi’s has not sought to establish, and I have not found, that in the circumstances, Zussman’s tak *299 ing the position that the April 13 agreement was void shortly after signing it was itself unfair or deceptive conduct. However, Zussman’s retention of the $13,983.86 which Kristi’s paid on April 14, 1995 in accordance with the April 13 agreement, his own refusal to follow through with his related obligation to dismiss the summary process action and his retention of the higher May rent payment a few weeks later present something different. What this conduct shows is that Zussman was following a consistent course of accepting the benefits available to him in the April 13 agreement while denying to Kristi’s the benefits that the agreement offered the restaurant in the form, inter alia, of a twenty-two-year lease and a set rental amount for the next twelve years. Particularly when this conduct is considered in conjunction with Zussman’s later attempt to charge Kristi’s a figure more than $5,000.00 above the rent set in the April 13 agreement — a unilateral move that also violated the provisions of the 1988 lease agreement under which presumably Zussman was purporting to act (see p.8 and n.15 above) — I conclude that Zussman has acted in disregard of his contractual obligations in a manner designed to secure unilateral advantages for himself and more particularly in a manner that was unethical, unscrupulous and oppressive. See, e.g., Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 27 (1997); Massachusetts Employers Ins. Exch. v. Propac Mass. Inc., 420 Mass. 39, 42-43 (1995); Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991).
In order to establish a violation of G.L.c. 93A, §11, Kristi’s must prove that it has suffered a loss of money or properly. It has done so, even though I agree with Zussman that Kristi’s has taken the position in this litigation that does not actually seek to recover monetary damages. As just indicated, Zussman retained the monies paid to him by Kristi’s under the April 13 agreement while denying the validity of that agreement, obligating Kristi’s to bring suit in order to establish whether the April 13 agreement was or was not binding on Zussman. For the period of time that Zussman retained these monies before the agreement was declared valid, he deprived Kristi’s at least of the use of these funds, and suffered damages in the form of interest lost on the money wrongfully retained.[16] Cf. Kapp v. Arbella Mut. Ins. Co., 426 Mass. 683, 686 (1998).
Zussman also violated c. 93A, §11 by his conduct in relation to Kristi’s sign. The three lease agreements that have sequentially governed the parties’ relationship all contain provisions authorizing Kristi’s to have a sign, and the most recent of these, the April 13 agreement, expressly states that Kristi’s “. . . shall be permitted to affix a sidewalk sign in same location as previous sidewalk sign existed.” Despite this clear language, in March 1997, Zussman simply announced he would not permit the sign to remain where it had been for years, and engaged in self-help to remove it. As of November 19, 1999, he still had not returned the sign. This is a breach of contract, but it is more. As the findings indicate, Zussman removed the sign in anger and to retaliate against Kristi's and Steven Ross specifically in connection with this lawsuit. That the conduct was petulant and immature does not detract from the conclusion that it was also unfair and oppressive in the context of Zussman’s other acts towards Kristi’s, including those described above and the sudden withdrawal of permission for Kristi’s managers to park.[17]
Kristi’s has also proved that it suffered a loss of money in connection with the removal of its sign. The cost of the sign, $500.00, is an obvious loss. And Kristi’s also established a loss of potential business revenues, albeit not quantified.
Kristi’s principal focus in seeking relief under G.L.c. 93A is attorneys fees and costs. In light of my conclusion that Kristi’s has proved violations of G.L.c. 93A, §§2 and 11, it is entitled to recover associated fees and expenses. Kristi’s lack of recovery of actual damages does not change this result, because Kristi’s has shown that Zussman’s conduct had an adverse economic effect on the restaurant. See Jet Line Svcs., Inc. v. American Employers Ins. Co., 404 Mass. 706, 718 (1989); Halper v. Demeter, 34 Mass.App.Ct. 299, 304 (1993). However, an award of attorneys fees and expenses must wait a further submission from Kristi’s.
ORDER
For the foregoing reasons, Kristi’s Restaurant Group has established a violation of G.L.c. 93A, §§2 and 11 as alleged in Counts V and VI of the third amended complaint, and is entitled to recover reasonable attorneys fees and costs in connection with these claims. Kristi’s is to serve on counsel for Zussman its fee application within two weeks, and thereafter counsel should call the clerk to schedule a hearing.

Kristi’s has indicated that at issue in this phase of the case are Counts III, IV, V and VI of its third amended complaint. Counts III, IV, and VI set out claims under G.L.c. 93A; Count IV seeks injunctive relief to prohibit the removal of refrigeration units Kristi's has installed behind the premises. At the trial held November 19, 1999, Kristi’s did not mention the refrigerator units or its request for a permanent injunction under Count IV. Moreover, in light of the jury's verdict on the defendant’s counterclaims, it does not appear that the request for injunctive relief remains a live issue and I do not further consider it.

The findings set out in the text deal with the separate incidents of allegedly unfair or deceptive conduct that were tried; the findings are organized chronologically in terms of the incidents. The factual findings contained in the memorandum of decision dated April 28, 1999 are incorporated into this decision.

Zussman’s conduct towards Kristi's since 1995 may suggest that Zussman has concluded the April 13, 1995 agreement is not as favorable to him as he believes it should be, particularly in terms of its extended length.

The monthly base rent called for in the parties’ prior lease agreement was $7,900.00.

Kristi's claim concerning the dumpster “fees” is not set out in its third amended complaint, but Zussman did not *300 contest Kristi's ability to try the claim at trial. Kristi's also sought to introduce evidence concerning Zussman's handling of a cracked beam on the restaurant premises in late 1994 and early 1995, which is not mentioned in the third amended complaint, but Kristi’s argues demonstrates a pattern of conduct violating G.L.c. 93A. Zussman objected on the grounds that the parties' April 13 agreement contains a mutual release with respect to all claims between them which were in existence at that time, and the dispute about repair of the cracked beam was one such claim. I admitted the documents and other evidence about the cracked beam de bene. I now rule that the documents should not be considered. The release does apply to the repair of the beam, and for this reason it seems inappropriate to consider it for any purpose, even as evidence of a pattern of conduct which allegedly extends into the period after April 13, 1995.

Kristi’s lease does not contain any provision for parking. However, Zussman for many years had permitted two of Kristi's managers to park their vehicles in the alleyway by the restaurant after 5:00 p.m. on weekdays and all day on Saturdays and Sundays. As indicated below in the text, Zussman had also extended this privilege to the managers of other Union Street lessees operating restaurants.

Zussman testified that his revocation of parking privileges had nothing to do with his deposition, but resulted essentially from Kristi's abuse of the privilege by parking too many vehicles in the alleyway and by bringing vehicles in to be parked before 5:00 p.m. on weekdays. I do not credit the explanation in light of the timing of the revocation and Zussman's own remarks at that time.

Kristi’s is located in an area where there are approximately six other restaurants nearby, and a lot of foot traffic. It is therefore important for the restaurant to be able to make its presence known to those using the nearby streets and sidewalks.

The parties had disputed the appearance and location of the sign in the past. In January of 1995, an employee of Zussman’s had written Kristi’s to insist on the removal of the sandwich board sign, but the sign was not removed at that time.

Zussman testified that he caused Kristi's sign to be removed because he understood it was right in front of the store of another tenant, the Big Sky Bakery or Greatful Bread, and he felt he was obligated to protect the tenant. I do not credit the testimony. According to Zussman, the tenant in question became a tenant in 1993 or 1994. There was no explanation as to why Kristi's sign suddenly became a problem for the tenant in late March of 1997.

Kristi’s also established an escrow account in May 1997, into which it deposited approximately $48,000.00, which it states is the total additional amount it owes in rent under the April 13 agreement for the period from June or July 1995 through May 1997, when it was paying $7,900.00 per month rather than $9,000.00. See Memorandum of Decision dated April 28, 1999, p. 8.

 Presumably this amount represents the base rent with some additional charges added on. There does not appear to be a dispute that this is the amount the April 13 agreement required to be paid for monthly rent in June 1997.

The notice has the date of June 17, 1997 typed on it, but I assume from its contents and the fact that there is also a notice to quit dated June 16, 1997, that the “June 17, 1997" should read "July 17, 1997."

Paragraph 10(b) of the 1988 agreement provides that the original lease term is to be extended for a period of ten years, from May 13, 1997 to May 13, 2007. Paragraph 10(c) then provides that the rent for the ten-year extension period
. . . shall be determined based upon the market rent for a similarly situated restaurant premises as of January 1, 1997. If Lessor [Zussman) and Kristi's cannot agree by February 1, 1997 as to what said market rent shall be, then Lessor and Kristi's agree that they shall each submit its market rent figure to a single arbitrator . . . Said arbitrator shall then select either the Lessor's market rent figure or Kristi's market rent figure, whichever market rent figure said arbitrator determines as most equitable . . .
There is no indication that Zussman and Kristi's undertook to determine and agree upon a market rental value in accordance with these 1988 lease provisions.

 I have previously indicated that Zussman did not violate c. 93A by taking the position, in May of 1995 and thereafter, that the April 13 agreement was invalid. But Zussman cannot have his cake and eat it too. If he wished to proceed on the theory that the April 13 agreement was void, he was obligated to return to Kristi’s the monies Kristi's had paid under that agreement's terms. Since he did not do so, he can be held hable for the damages associated with his retaining the amounts in question, viz., interest on the monies for the period he wrongfully retained them.

Zussmaris withdrawal of parking privileges is the focus of one of Kristi's counts for violation of G.L.c. 93A. (Third amended complaint, Count III.) I conclude that Kristi's has failed to prove this count because there is no evidence of loss of money or property to Kristi's itself as a result of Zussman's challenged conduct. See G.L.c. 93A, §11.