Roach, Christine M., J.
This case was tried to a jury from January 15, 2013 through January 31, 2013. Plaintiffs were three commercial tenants in the Chinatown neighborhood of Boston, each of whom rented small shop spaces owned by Defendant K&W Realty (K&W) and managed by Defendant David Wong (Wong) and his son, Peter Wong. Plaintiffs presented a variely *549 of business tort and contract claims against all of the Defendants based on the allegedly unsanitary and unsafe conditions under which Plaintiffs’ businesses operated for a decade. Following deliberations over two days, the jury returned a mixed verdict in the form of answers to literally dozens of special verdict questions.
The parties timely submitted their requests for findings and rulings on the Chapter 93A claim, which the court reserved. Following hearing April 3, 2013 and supplemental filings, and for the reasons stated her e, judgment shall enter in favor of each Plaintiff, and against Defendants K&W Realty and David Wong on Count III of the Third Amended Complaint,[1] for their liability pursuant to G.L.c. 93A, and for doubling of the damages awarded by the jury on the common-law claims, for these Defendants' knowing and wilful violation of the statute.
FINDINGS OF FACT
All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determinations of the credibility, weight, and probative value of the evidence adduced at trial and reasonable inferences drawn from that evidence, as well as stipulations by the parties.[2]
The Parties
1. Defendant K&W Realty has owned the commercial property at issue for decades. The building, which comprises a full city block and is over 100 years old, included at all relevant times approximately 10-20 commercial units total, as well as 19 residential apartments. It is located at the corner of Washington and Kneeland Streets in the Chinatown neighborhood of Boston, with an address of 694-702 Washington Street.
2. K&W is a family real estate business headed by patriarch Defendant David G. Wong, who is a native of Hong Kong, and was 82 years old at time of trial. Wong’s native tongue is Toishanese. He testified through an interpreter at trial, and stated that his command of English is “sixty or seventy per cent.”
3. Wong’s son Peter Wong is a lawyer bom and educated in this country whose first language is English. Prior to 2005 Peter assisted his father with “drafting instruments, maintaining files, and paying bills.” Beginning in 2005 Peter added to these “back room” responsibilities by providing “on-site management” of the building. Peter would “walk the property,” “screen out problems,” and “direct contractors.” None of the other members of the Wong family was involved in K&Ws business or with this building.
4. Wong himself was present on the premises every day during the period 1999 through 2009, because he worked from approximately noon to ten o’clock in the evening, seven days per week, managing the Empire Garden restaurant—a large establishment including function space capable of seating 300 people—which was located on the second floor of the building. Wong owns, manages, and is the sole shareholder of Empire Garden. Peter testified tenants and others always “knew where to find my father [at the Empire Garden]. ”
5. The Plaintiffs rented small shop spaces in the building, at Numbers 8, and 10-12 Kneeland Street, respectively, during the period 1999 through 2009. These shops were located on the first floor street level, in the right-hand lower corner of the building as viewed from Kneeland Street. The vast majority of the shop space for 8-12 Kneeland Street was located directly below parts of Empire Garden. Plaintiff Peter Kuong operated a hair salon at 10 Kneeland, and held a lease for 10-12 Kneeland with K&W. Plaintiff Kim Pham operated a dressmaking/seamstress shop at 12 Kneeland which she sub-leased from Kuong. The third shop at 8 Kneeland operated as a Vietnamese restaurant under a variety of names over the decade, most recently Pho 54. Although some dispute exists with respect to who Wong recognized to be the proper tenant at 8 Kneeland Street, there is no dispute that Plaintiff Mary Mauit Nguyen operated the restaurant, or that her agents/principals/assigns held a lease with K&W, or that K&W accepted rent checks from Pho 54 as early as 2002.
The Rental Relationship
6. Sometime in early 1999, prior to the tenancies at issue, a fire damaged large portions of the first floor of the building, as well as the second floor location of Empire Garden. K&W chose to rebuild by providing a “shell” only for the first floor, and entering into leases which required new tenants to do their own “build out.” Each of the Plaintiffs did so, investing among them hundreds of thousands of dollars, notwithstanding the undisputed fact that each of the two leases clearly provided that “improvements” would become property of the lessor. The build out at 10-12 Kneeland involved separating the space into two shops (one for Kuong and one for Pham) by adding a wall, to which Wong agreed.
7. Plaintiffs are all refugees from communist Viet Nam. Nonetheless, in 1999 they were well-educated people of some means, and by time of trial well experienced in business. Kuong’s mother is also a hairdresser, and had occupied the space at Kneeland Street prior to the fire in 1999. Pham at one point operated her dress shop in three Boston locations. And Nguyen owns investment real estate throughout Boston. Pham and Nguyen both testified at trial through a Vietnamese interpreter; Kuong is fluent in English.
8. The investment in the Kneeland Street build out represented substantial portions of each of the Plaintiffs’ families’ savings and net worth. Plaintiffs made the investment with the expectation of being able to remain at the property for a significant period of time, and because plying their respective trades was the only way for them to support their families.
*550 The Breach of Quiet Enjoyment
9. Each of Plaintiff tenants complained on multiple occasions over a ten-year period of their business operation, either to employees of Empire Garden, to David Wong himself, or to Peter, about water leaks into their respective spaces, which the Plaintiffs feared were coming from the restaurant. Pham complained primarily to Kuong, because she understood she was not leasing directly from K&W. But she also had direct communications with Wong, who told her there was no leakage.
10. The time frames and nature of the leaks and the complaints varied. The restaurant at 8 Kneeland Street experienced a “gushing” leak from one location in the ceiling on the veiy first day of its scheduled grand opening in late 1999. Nguyen’s business partner Robert Tran rushed upstairs to Empire Garden and found restaurant employees pouring buckets of water on the restaurant floor to clean it. Tran “begged” Wong to stop the cleaning so the downstairs restaurant could have a good opening, and that leak stopped that day, but later returned in the same location over the cash register. Nguyen testified to other, smaller leaks around the restaurant, and to using buckets and other containers to collect water throughout the time of her restaurant’s operation.
11. A few months into his tenancy in 1999, Kuong began to notice “trickles” of water down the wall in his hair salon at 10 Kneeland Street. At first Kuong was not overly concerned, but the locations and amount of water increased over time, to the point where he was regularly stationing buckets throughout his shop to catch and collect the water. A particularly disturbing leak developed and increased in the restroom area of the salon, including odors from the water which contained other debris, to the point where the salon customers could no longer safely use the facilities. Kuong described the water as smelling “like a sewer,” or “gutted fish.”
12. Different sorts of leaks invaded the dress shop at 12 Kneeland Street. The build out in that area had created a second-floor “loft” space where Pham stored a great deal of her merchandise. The ceiling of the loft began to leak persistently, creating odors of mold. At one point Pham, at the suggestion of a customer, used large plastic sheeting to cover the clothing. On one of Wong’s visits to the shop in response to Pham’s complaints about leaks, Wong saw the plastic sheeting and told Pham to remove it. In addition, Pham began experiencing persistent leaks in the back right comer of her shop, where one of the dressing rooms was located. These leaks appeared to be entering through either the back wall or the ceiling area, including through light fixtures. Pham described the water entering her shop as smelling “moldy.” When Pham complained about these leaks to Kuong, he advised her to catch the water in buckets, as he did in his own unit. Eventually Pham resorted to emptying multiple buckets several times per week.
13. Many of the water leaks which entered into the first floor commercial shop spaces came through the ceilings in those shops, and were ultimately traced to the floor of the Empire Garden restaurant above, which was separated from the first floor by iron girders or joists, and several feet of empty common space. The tenants did not control this common space. The existence of the space, however, exacerbated a separate and persistent problem for the units—rats and mice.
14. It should have come as no surprise to anyone involved in this story that an old downtown building housing a large and busy restaurant would have such a problem, and the general existence of that problem per se cannot be blamed on these Defendants. Rather, the issue for judge and jury was to assess how the Defendants managed the problem, and the impact it allegedly had on Plaintiffs’ quiet enjoyment of their commercial tenancies, not to mention public health. The evidence is undisputed Wong had a longstanding relationship with a pest control firm, that the company made regular visits to the building, and that it produced reports of its findings and work with its bills. Nonetheless, Plaintiffs consistently testified to hearing rats “running” through the common space above the ceiling; smelling dead rats (an “unbearable” stench in the summer, according to Kuong); and finding evidence of rats within their units. Pho 54 hired its own exterminator, but Nguyen nonetheless experienced difficully keeping the restaurant sanitary despite her hard work attempting to do so. Complaints to Defendants about rats fell on similarly deaf ears from the Plaintiffs’ point of view.
15. For example, on June 5, 2007 the City of Boston Inspectional Services Department issued to Wong a Notice to Abate a Public Health Nuisance relating to Pham’s unit at 12 Kneeland Street. ISD stated: “2nd floor (Loft) ceiling tiles broken, soiled from water leaks. This has been an ongoing problem.” It directed: “Provide pest company report of how the infestation of mice is going to be eliminated,[1]—the mice are coming down from the ceiling in the loft.—This action should provide a way to deodorize the store. This is also an ongoing problem.” No written followup exists on this Notice, but for a reported visit by Braman dated 6/12/2007 stating that “an inspection on Thursday, June 7th resulted in no findings of any current rodent infestation evidence.” Pham testified that although a few ceiling tiles might have been replaced, nothing else was done to “abate” these interferences with her quiet enjoyment of the unit. I note a letter from K&W responding to Pham’s written complaints of February 2007 is dated June 8, 2007.
16. At various times between 1999 and 2009, Wong directed certain repairs at Empire Garden in response to Plaintiffs’ complaints, including re-tiling an area of *551 flooring in the kitchen, and installing new flooring around the refrigerators.
17. At an unspecified time following complaints by Plaintiffs and repair work, the employees of Empire Garden were instructed to “damp mop” the floors, but no longer to use open buckets of water with direct water contact on the floor. There is no evidence that the open bucket method continued throughout the length of the tenancies into 2009.
18. The denouement of these business relationships came in April 2009, when ceilings in two of the three units, 12 Kneeland and 8 Kneeland, literally came crashing down, bringing with them dead rats, food debris, and moldy plaster and other building materials, whereupon the City closed the shops at 8-12 Kneeland Street.
19. As of April 3, 2009, inspectors for the Boston Public Health Commission determined violations of 105 CMR section 410.602A (sanitation) and G.L.c. Ill, section 122 (nuisance and health hazards). Handwritten “emergency” ISD Inspector’s Violation Reports stated that the “[f]loor/ceiling assembly [of Empire Garden] has sustained extensive water damage. Water damage has compromised the structural integrity of the kitchen floor of restaurant on 2nd floor and ceiling of occupancies at 8-12 Kneeland St. causing unsafe and dangerous conditions”; and “maintenance: floor ceiling assembly damaged by water caused a partial collapse extensive water damage rodent infestation and mold visibility.”
20. City inspectors on the scene the day of the closing testified that strong odors could be detected from outside on the sidewalk, and that the moisture within the units suggested “extensive leaking coming from somewhere.” One City inspector testified credibly that upon receiving these notices at the scene, Wong announced to the inspector that “it was their [the tenants’] fault.”
21. After the units were essentially gutted to reveal all of the common space and infrastructure above them, contractors hired by Wong (Fitzgerald and Choo), as well as the City inspectors were able to observe saturation of the ceilings, saturation of the Empire Garden floor, and two active leaks from flow drains and a plumbing chase within Empire Garden.
22. The trial record also provides evidence that Empire Garden was not necessarily the sole source of water leaks into all of the Plaintiffs’ units. Fitzgerald and Choo each observed deficiencies with the build out accomplished by Kuong and/or Pham to the back of 12 Kneeland Street in 1999. At that time an addition of sorts (referred to at trial as “the shed”) was built onto 8 Kneeland, into the alley on that side of the building, and connected to a portion of the Empire Garden outside space. Wong’s contractors testified that this addition lacked proper flashing, and that water had been coming in along the decking from the alleyway when it rained. Choo went on to speculate that this “shed” at 8 Kneeland could have been the source for all of the water that later “tracked” or “channeled” along the Empire Garden floor. I decline to credit that speculation.
LEGAL STANDARDS
1. For claims brought under G.L.c. 93A, §11, the court must undertake a “dual inquiry” into whether the interaction between the parties is commercial in nature, and whether both parties are engaged in “trade or commerce.” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1,22-23 andn.33 (1997). Intra-entity relationships are outside the reach of the statute. First the court assesses whether the interaction is “commercial” in nature, and second, it evaluates whether the parties were both engaged in “trade or commerce” and thus acting in a “business context.” For the latter analysis the court applies the test discussed in Befel-gerv. Najarían, 381 Mass. 177, 190-91 (1980). Linkage Corp. Szalla v. Locke, 421 Mass. 448, 451-52 (1995). The statute “creates a sharp distinction between a business person and an individual who participates in commercial transactions on a private, nonprofessional basis.” Lantnerv. Carson, 374 Mass. 606, 610 (1978). Private individuals who engage in an isolated financial investment are not doing so in a business context. Lynnv. Nashawaty, 12 Mass.App.Ct. 310, 313 (1981). While the line is not always clear, “[ufltimately the choice appears to turn on whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons.” Frullo v. Landenberger, 61 Mass. App.Ct. 814 (2004).
2. The existence of unfairness for purposes of the statute must be determined from all of the circumstances of each case. Marram v. Kobrick Offshore Fund, 442 Mass. 43, 61 (2004). The fact finder may consider whether the challenged acts fall within some established concept of unfairness, and whether the defendant’s acts or practice was immoral, unethical, oppressive, unscrupulous or caused substantial injury to competitors, people or businesses. Nova Assignments, Inc. v. Kunian, 77 Mass.App.Ct. 34, 43 (2010). A trial judge may make independent and different findings on the Chapter 93A aspects of a case that arises from the same facts which gave rise to a parallel common-law claim. Klairmont v. Gainsboro, 456 Mass. 165, 186-87 (2013).
3. While the viability of underlying contract, tort and fiduciary claims is instructive, and may be dispos-itive when the Chapter 93A claim is wholly derivative, Chapter 93A liability may sometimes be based on conduct that is neither tortious nor a breach of contract. Casavant v. Norwegian Cruise Line, Ltd., 460 Mass. 500, 503 (2011); Synergistics Technology, Inc. v. Putnam Investments, LLC, 74 Mass.App.Ct. 686, 689-90 (2009) (and cases cited) (finding, however, that conduct relied on to support claim was neither unfair *552 nor deceptive as a matter of law). See also, Lily Transportation Corp. v. Royal Institutional Services, Inc., 64 Mass.App.Ct. 179, 204-11 (2005) (concurrence and dissent) (collecting cases).
4. A violation of the state building code does not necessarily qualify as a violation of Chapter 93A. A law or regulation at issue must be intended to protect consumers, and is “bound by the scope of c. 93A, section 2(a). In other words ... a violation of the building code will be a violation of c. 93A, section 2(a) only if the conduct leading to the violation is both unfair or deceptive and occurs in trade or commerce. And whether the particular violation or violations qualify as unfair or deceptive ‘is best discerned from the circumstances of each case.’ ” Klairmont, 465 Mass, at 173-74.
5. To meet the wilful or knowing components of the statute for purposes of multiple damages, a Plaintiff has the burden of proving defendants held a subjectively culpable state of mind, which requires more than mere negligence. It contemplates a more purposeful level of culpability, that is, a conscious disregard for the likely results, and the intentional employment of sharp practices. Whelihan v. Markowski, 37 Mass.App.Ct. 209, 212 (1994); Squeri v. McCarrick, 32 Mass.App.Ct. 203, 208 (1992); Wasserman v. Agnoastopoulos, 22 Mass.App.Ct. 672, 680-81 (1986); Kristi’s Restaurant Group, Inc. v. Zuss-man, 2000 WL 28513 (Mass.Super. Feb. 14, 2000) (Botsford, J.) [11 Mass. L. Rptr. 297],
6. Recklessness, in the sense of knowing disregard for contractual or other obligations, may constitute wilfulness under the statute. “Ultimately, c. 93A ties liability for multiple damages to the degree of the defendant’s culpability.” Kattar v. Demoulas, 433 Mass. 1, 15-16 (2000); Gore v. Arbella Mut. Ins. Co., 77 Mass.App.Ct. 518, 532-33 and n. 14 (“Aperson acts ‘knowingly’ with respect to a result if ‘he is aware that it is practically certain that his conduct will cause such a result’ ’’). The cumulative effect of multiple, long-term violations may be considered by the trial judge on the question of wilfulness. Brown v. LeClair, 20 Mass.App.Ct. 976, 980 (1985) (rescript).
7. Multiple damages are designed to impose a penalty on the defendant. The purpose of multiple damages is to deter callous and intentional violations of the law, and to promote prelitigation settlements by making it unprofitable for a defendant to ignore a plaintiffs request for relief. The fact finder must take into consideration all of the relevant circumstances, including the character and degree of the wrong as shown by the evidence, the necessity of preventing similar wrong, and the defendant’s degree of culpability. Faulty performance alone does not necessarily rise to the meretricious quality signified by wfifulness. If a defendant commits a wilful or knowing violation of the statute that finds its roots in an event or transaction that has given rise to a judgment in favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of that judgment. Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 499-501 (2012); International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 857 (1983); Heller v. Siluerbranch Conste Corp., 376 Mass. 621 (1978); Brown v. LeClair, 20 Mass.App.Ct. at 980.
RULINGS
1. Each of the Plaintiffs—Peter Kuong, Kim Pham, Marymaiut Nguyen, and Pho 54 was engaged in trade or commerce, as were Defendants K&W Realty and David Wong. Each of the Plaintiffs had a substantial business relationship with K&W and Wong. While I respect that Pham was not a direct lessee of K&W, and Nguyen’s tenancy was entered into, assigned, and maintained by her agents (Mr. Van Cao and Mr. Tran), or her principal (Pho 54), both of these women were on-site daily; were known and acknowledged by K&W and Wong to be the full-time operators of their respective shops; were the source of rental payments; and were the source of complaints about conditions in the building. The effort by K&W’s lawyers to deflect Pham’s written complaint of February 2007, based on the alleged proper party to the tenancy at 12 Kneeland Street, cannot defeat the reality of this business relationship for statutory purposes, which I find was neither minor nor insignificant. The Defendants were acting in a business context with respect to each of the Plaintiffs throughout the period 1999 to 2009, and the claims are thus cognizable pursuant to G.L.c. 93A, sections 2 and 11.
2. K&W Realty and David Wong committed unfair acts in their business relationship with the Plaintiffs. The evidence of these acts in the trial record is legion. It was unfair for these Defendants to engage in a course of conduct over a ten-year period including: 1) to fail to respond to complaints of leaks, odors, and rats by visiting the shops in a timely manner when a complaint was made; 2) to visit a shop randomly when some complaintwas made, nod, state that a complaint would be addressed, and then do nothing about that complaint; 3) to permit employees of Empire Garden to throw buckets of water on the floor of the restaurant for a period of years before prohibiting that conduct; 4) to investigate recurring complaints, on the same topics (leaks, rank odors, rats, and maggots), from three different tenancies, only in the most cursory and isolated fashion over a ten-year period, all the while failing to address one or more obvious, building-wide problems; 5) to fault the tenants themselves variously for choice of lighting, air conditioning units, ceiling tiles, protective plastic, or maintenance, when these fixtures had nothing to do with the complaints, because the water, the odors, and the pests were entering the units from outside those units through the ceilings above; and 6) to walk away from the tenants and their customers when they attempted to speak about com *553 plaints, and/or to insinuate that the landlord was somehow protected by City officials.
3. The state of the three units as documented by the City in April 2009, the state of the infrastructure of that portion of the building as documented by the Defendants’ own contractors once the units were closed for business, and the costs of the necessary rebuilding ultimately undertaken, all demonstrate a system-wide failure of the units to meet basic standards of commercial habitability over a significant period of time sufficient to include the four-year statute of limitations for Chapter 93A. In addition I credit Plaintiffs’ testimony about the number and timing of their complaints, as well as the longstanding existence of these violations, notwithstanding the continued operation of their shops throughout, and the somewhat implausible reality of all three tenants remaining in their locations under the circumstances. I do so for a variety of reasons, including but not limited to: independent corroboration by customers; the Plaintiffs’ distinct styles and demeanors while testifying; the varied descriptions of their experiences with their units and the Defendants; as well as corroboration observed from the demeanor of the Wongs themselves at trial.
4. The Defendants’ cumulative behaviors in allowing the conditions to persist violated the statute regardless of whether the primary source of the leaks was the day-to-day operation of Empire Garden, the build out of the “shed” in the alley that became part of the unit at 12 Kneeland Street, or some other unnamed source(s). K and W, and Wong as its agent, were the owners and landlords of a very large, old, commercial building in the middle of a downtown urban neighborhood. They had a legal duty to deliver a premises that provided quiet enjoyment to their commercial tenants under all of those circumstances, in return for rental payments. This included a duty fairly and diligently to investigate and to cure conditions which compromised that enjoyment.
5. The jury found, and I agree, that these Defendants breached that common-law duty, and that Defendants’ breach proximatefy caused harm to the Plaintiffs. Defendants did so thoroughly and consistently, all the while demonstrating utter indifference to the plight of their tenants and to the wellbeing of the consuming public. The fact that the jury found in Defendants’ favor on two counts of intentional tort is in no manner dispositive of the independent statutory standard for purposes of these findings and rulings. Likewise, the fact that the jury found negligence by Kuong contributed to the losses at 10-12 Kneeland Street only underscores the care and reasonableness with which the jury considered the evidence. It in no way impacts the court’s assessment of the recklessness of Defendants’ own behavior.
6. The documented code violations in this case merely corroborate the pattern of behavior which I find to be unethical, unfair, and unscrupulous, culminating in the abject state of the shop units in April 2009, and the undisputed loss to the Plaintiffs of their businesses. The code violations here do not stand alone, and I need not consider whether they would stand alone to establish a statutory violation.
7. I have carefully considered the question of wilfulness, and can only rule on this record that the behavior of Wong, and through him, K&W, qualifies as reckless in the extreme. Contrary to counsel’s argument, the behavior at issue here bears no resemblance to an “inept blend of hopeful dissembling and dogged bumbling.” Wong is a highly experienced and savvy businessman. He had access to any “team of professionals” he wanted to employ to assist him in managing the building properly. It is clear from the evidence, however, that Wong relied sporadically on “handymen” of limited quality (Ping Wong, Kenny Yip, Peter Zen), and a pest control company (Braman) which he essentially kept on retainer, and the contents of whose reports he did not review. Wong only turned to more experienced (and more expensive) contractors like Fitzgerald and Choo in times of disaster at the building, like the 1999 fire and the 2009 collapse.
8. Wong’s testimony and demeanor at trial fully support a finding of reckless indifference to and disregard for his obligations to his commercial tenants. I have factored into my assessment of this witness the constraints of speaking through an interpreter, and the possible cultural differences in phrasing and syntax, as well as Wong’s age. I find none of these factors can mask or alter the fact that Wong fully understood his obligations as a landlord, and consciously chose to behave in the manner he did towards the Plaintiffs. We know this because Wong behaved in exactly the same manner as that repeatedly described by Plaintiffs’ witnesses when he testified for judge and jury. Wong acknowledged awareness of all of his legal obligations, but then denied the building had systemic problems with water, pests, or mold. He denied receiving regular complaints from all three units. He again blamed the tenants for their problems. And, when he did not like a question put to him by counsel, or did not want to answer that question, Wong simply ignored the question or talked himself away from it. I am unable to credit the vast majority of Wong’s testimony.
9. Peter Wong was more than capable of assisting his ageing father in managing the building. However, the younger Wong’s demeanor at trial also compromised his credibility. Peter was abrupt and dismissive when presented with facts tending to support Plaintiffs’ claims, but then became quite expansive when discussing his expertise about the building and his contributions to the family business. Peter’s demeanor suggested either a voluntary subscription to his father’s indifference, or an obedience to his father’s will. I am unable to credit Peter Wong’s version of key *554 events and conversations with the tenants, or his self-serving assessment of the primary source of the decade of leaks being the “shed” at 12 Kneeland Street.
10. For all of these reasons, each Plaintiff is entitled to double the total amount of damages assessed by the jury on the common-law claims, as the fair and appropriate penalty for this finding of a wilful and knowing violation of Chapter 93A. Plaintiffs are also entitled to recover statutory attorneys fees and costs.
11. Plaintiffs are not entitled to additional categories of damage recovery. While I (and, apparently, the jury) found the Plaintiffs credible on the fundamentals of their claim—i.e. that their shops were consistently compromised by water and pests throughout the tenancies—I am not persuaded Defendants should be required to compensate Plaintiffs for all of the business choices these experienced adults made over the decade. Kuong and Pham both knew the property and its landlord before 1999, and nonetheless chose to rent there. Pham chose her subleasing arrangement, knowing that (for reasons unexplained) K&W would not rent to her directly. All of the Plaintiffs possessed both business experience and significant family resources, and exercised conscious business judgment to invest those resources in developing their shop units. Kuong chose to renew his lease in 2005. The tenants engaged in only limited and sporadic self-help (hiring family or friends to patch or to exterminate), and apparently did not retain experienced legal counsel until after their shops literally collapsed. And, Pham made a series of dubious decisions about how to manage her allegedly damaged inventory post-closing.
12. All of these choices properly impact a factfinder’s weighting of testimony and exhibits. The jury awarded Kuong and Pho 54 significant rent damages, a category unavailable to Pham. The jury was more conservative with respect to the claims for fixtures, inventory, costs, and emotional distress. Pham nonetheless received a sizeable award for her lost inventory. By requesting additional categories of damage pursuant to Chapter 93A, Plaintiffs are essentially asking the court to circumvent the provisions of the leases which indisputably allowed K&W to retain the value of the improvements (whatever those might have been after the collapsed ceilings and closure by the City), and instead to award that value as statutory damages.
13.1 decline to do so, for a number of reasons. First, I am not persuaded by the “David vs. Goliath” characterization of these relationships argued by counsel. I cannot find Plaintiffs to be nearly so helpless, naive, or resourceless as claimed. Plaintiffs signed the leases they signed, choosing to take the risk that their “expectations” to work happily at that location indefinitely would be realized. Many contingencies could have thwarted that expectation. The fact that Plaintiffs believed it was not economically feasible for them to “abandon” their investment is not controlling.
14. Second, I do not find, as Plaintiffs now argue, that the jury verdict was “inexplicably low in view of the evidence.” Rather, I find it to have been reasonably based in that evidence. To take the most obvious example, Pham’s testimony and exhibits about the value of her inventory (damaged or not) was confusing, at best. Her subjective assessment of value, while admissible, need not have controlled, and was subject to some persuasive impeachment. By way of example only, the jury reasonably could have found Pham’s tax return reports of the inventory value of her business to be inconsistent with her testimony at trial.[3]
CONCLUSION
For the reasons stated, Plaintiffs are entitled to judgment against Defendants K&W Realty and David Wong, jointly and severally, on Count III of the Third Amended Complaint, as follows:
Double the damages awarded to each Plaintiff by the jury on the common-law claims, by reason of the court’s finding of wilful and knowing violations of G.L.c. 93A; and
Reasonable attorneys fees and costs associated with pursuing the statutory violation; detailed and documented fee petition to be submitted, together with any opposition, no later than forty-five days from the date of the final judgment order.

Judgment has already entered in favor of Defendant Empire Garden, LLC on all claims.

The eleven trial days encompassed the testimony of 16 witnesses, and submission by the parties of over 50 exhibits. A handful of additional exhibits have been proffered by Plaintiffs on the c. 93A claim. The court distills for purposes of this Memorandum only those facts and legal issues which it finds controlling on the statutory claim.

Plaintiffs’ argument that judge and jury have somehow missed key evidence by not examining moldy clothing inventory is unpersuasive. First, to the extent Pham believed alleged moldy inventory was important to her case, and she sought to introduce damaged garments as evidence, she was required as with any other exhibit to have selected, organized, and proffered those specific items pre-trial. This she did not do. Second, even had unexpected trial testimony warranted late proffer of exhibits (which it did not), counsel was obliged to propose a method for admission of such items whereby jury and staff would not risk exposure to potentially harmful material. Instead, Plaintiffs proposed that a bag of allegedly moldy clothing be removed from storage, brought to the courtroom, and opened before the jury mid-trial. When one adds Defendants’ legitimate chain of custody and discovery disclosure concerns to this scenario, the appropriate balance seemed obvious to the court at the time, and continues to seem so.