APPEALS COURT 
 
 JOSEPH TRITES & another[1] vs. PETER CRICONES & another[2]

 
 Docket:
 23-P-884
 
 
 Dates:
 October 8, 2024 – February 7, 2025
 
 
 Present:
 Neyman, Singh, & Toone, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Practice, Civil, Directed verdict. Nuisance. Real Property, Nuisance, Sale. Contract, Sale of real estate, Implied covenant of good faith and fair dealing. Consumer Protection Act, Unfair or deceptive act. Damages, Consumer protection case.
 
 

       Civil action commenced in the Superior
Court Department on October 12, 2018. 
      The case was tried before Christopher K.
Barry-Smith, J. 
Edward A. Prisby
for the defendants.
John G. Mateus
for the plaintiffs.
      TOONE, J. 
The defendants, Peter Cricones and Reedy Meadow LLC (Reedy Meadow),
appeal from a judgment entered in favor of the plaintiffs, Joseph and Kim
Trites.  After the Triteses purchased a
home in the defendants' new development in the town of Pepperell, they
discovered that their yard was contaminated by Japanese knotweed, an invasive
and destructive plant, as well as large shards of glass and metal debris.  Following a trial in the Superior Court, the
jury found for the Triteses on their claims for private nuisance and breach of
the implied covenant of good faith and fair dealing, and the judge ruled that
the defendants also violated G. L. c. 93A, §§ 2 and 9, awarding
the Triteses the same damages determined by the jury for the other claims (so
that the over-all judgment did not increase), attorney's fees and costs, but
not multiple damages.  We conclude that
even though the defendants' motion for a directed verdict should have been
allowed on the nuisance and implied covenant claims, the evidence was
sufficient to establish a violation of c. 93A.  We also conclude that the evidence was
sufficient to support the judge's award of damages.  Accordingly, we affirm the judgment.
      Background.  Cricones owns and operates Reedy Meadow, a
real estate development company.  In
2015, the defendants bought a vacant, overgrown gravel pit in Pepperell, with
the aim of turning it into a twenty-seven-lot housing development.  After excavating the foundations for the
lots, the defendants used loam, a combination of clay, sand, and silt, in the
course of developing the lots.  Some loam
used was hauled in from an outside source, some was obtained from excavating
the roads of the development, and some was taken from a pile of loam left
behind by the site's gravel operation. 
Japanese knotweed grew from the pile five feet high.  Similar in appearance to bamboo, Japanese
knotweed is an invasive species with an unusually deep root structure.  Unless its rhizomes and root systems are
removed from the soil, it spreads easily, displaces other plants, breaks
through concrete and asphalt, and is difficult to eradicate.  The defendants' excavation contractor
testified that he saw the Japanese knotweed growing in the pile and warned
Cricones not to contaminate the other loam with it, but Cricones decided to use
loam from the pile, mix it with the trucked-in loam, and spread it throughout
the development.
      In April 2017, the Triteses executed a
purchase and sale agreement to purchase a home in the development for $435,000
(property).  When they first toured the
property in the early months of 2017, there was snow on the ground.  The Triteses arranged for an inspection in
April, but the inspector did not conduct a soil analysis and could not inspect
the lawn because it was covered by hydroseed. 
The Triteses closed on the home in May. 
A leafy weed soon appeared in the Triteses' lawn, which their neighbor
informed them was Japanese knotweed.  By
fall, knotweed was growing throughout the yard, all around the house's
foundation and under the deck, and was starting to sprout through the walkway
pavement.  A restoration ecologist
testified that approximately thirty-five percent of the property was
infested.  In addition, there was a
copious amount of glass and metal debris in the soil, which caused children
playing in the yard to cut their feet. 
At trial, the Triteses presented for the jury's view what the judge
described as "two very large buckets and a crate, filled with glass shards
and metal refuse, some pieces very small and some quite large," that the
Triteses had pulled from their yard.
      Between May and October 2017, Cricones
made what the judge characterized as "half-hearted" efforts to combat
the Japanese knotweed on the lot.  He did
not consult with landscape professionals knowledgeable about the problem.  He sent a contractor to try to pull out the
knotweed, but that did nothing to eradicate it. 
One of Cricones's workers tried to excavate the knotweed with a compact
tractor, but that also failed.  Cricones
advised the Triteses to use a commercial weed killer to control the knotweed,
but they did not want to expose their children to the toxicity of that product.  The relationship between the Triteses and the
defendants deteriorated.  The Triteses
posted signs on their property and vehicles stating, for example,
"Japanese knotweed lives in our yard."  Cricones made threats and vulgar gestures,
and engaged in other actions in an attempt to intimidate them.
      The Triteses filed suit against the
defendants in 2018.  The judge reserved
the G. L. c. 93A claims for his consideration, and the remaining
claims were tried before a jury. 
Following a four-day trial, the jury responded to questions on a special
verdict form.  With respect to the
Triteses' claims concerning the Japanese knotweed and other defects in their
yard, the jury found for the defendants on the claim alleging breach of
contract as to an express warranty, and for the Triteses on nuisance and
violation of the implied covenant of good faith and fair dealing.  The jury also found that the defendants were
negligent as to the Japanese knotweed and yard defects, but that negligence did
not cause the Triteses' injuries.[3]  In
total, the jury awarded the plaintiffs $186,000 in damages:  $166,000 on the implied covenant claim, and
$186,000 on the nuisance claim, with $166,000 of the latter amount duplicative
of the former.
      After hearing additional argument, the
judge issued findings, rulings, and an amended order on the c. 93A claims,
concluding that the defendants had engaged in unfair or deceptive acts or
practices and caused damages of $186,000, the same amount determined by the
jury.  The judge also awarded the Triteses
reasonable attorney's fees and costs under G. L. c. 93A, § 9,
but, finding that the defendants' conduct was not willful or knowing, declined
to award the Triteses multiple damages. 
On appeal, the defendants challenge the denial of their motion for a
directed verdict on the Triteses' claims for nuisance and breach of the implied
covenant, the judge's c. 93A decision, and the determination of damages.[4]
      Discussion.  1.  The
defendants' motion for a directed verdict. 
A jury's verdict will be upheld "if it may be determined that
'anywhere in the evidence, from whatever source derived, any combination of
circumstances could be found from which a reasonable inference could be drawn
in favor of the plaintiff'" that supports the claim (citation
omitted).  Sullivan v. Five Acres Realty
Trust, 487 Mass. 64, 68 (2021).
      a. 
Nuisance.  "A private
nuisance action is the remedy for an invasion of a property right."  Connerty v. Metropolitan Dist. Comm'n, 398
Mass. 140, 147 (1986).  See Restatement
(Second) of Torts § 821D (1979) (defining private nuisance as "a
nontrespassory invasion of another's interest in the private use and enjoyment
of land").  To proceed with a claim,
the plaintiff must have an interest in the affected property, such as a fee
interest, an easement, or a tenancy. 
Connerty, supra.  In addition, the
invasion must come from beyond, usually from a different parcel of
property.  See Doe v. New Bedford Hous.
Auth., 417 Mass. 273, 288 (1994). 
Private nuisance actions have historically involved "conflicts
between neighboring, contemporaneous land uses."  Wellesley Hills Realty Trust v. Mobil Oil
Corp., 747 F. Supp. 93, 98 (D. Mass. 1990), citing Philadelphia Elec. Co.
v. Hercules, Inc., 762 F.2d 303, 314 n.9 (3d Cir.), cert. denied, 474 U.S. 980
(1985).  See Morrissey v. New England
Deaconess Ass'n -- Abundant Life Communities, Inc., 458 Mass. 580, 588 (2010),
quoting Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 231 (2002)
("A private nuisance is actionable when a property owner creates, permits,
or maintains a condition or activity on [its] property that causes a
substantial and unreasonable interference with the use and enjoyment of the
property of another").
      Accordingly, a buyer of land does not have
a private nuisance action against a seller for contamination of a property
prior to its sale.  In Sheehy v. Lipton
Indus., Inc., 24 Mass. App. Ct. 188, 190 (1987), the plaintiff purchased land
that he later discovered was contaminated by hazardous material.  The plaintiff sued the seller for private
nuisance, and this court affirmed summary judgment for the seller.  Id. at 191-192.  We explained that even though a seller may be
liable for a structure or condition that causes harm to "others outside of
the land," even after the buyer has taken possession, that liability does
not extend to an action by the buyer against the seller for nuisance.  Id., quoting Restatement (Second) of Torts
§ 373 (1965).  See Wellesley Hills
Realty Trust, 747 F. Supp. at 98-99 (dismissing nuisance claim against
defendant that contaminated property before selling it to plaintiff).
      Although the Triteses argue that, because
Japanese knotweed spreads rapidly, it could have migrated to their yard
"from other infected properties," the record does not support such a
finding.  Rather, the evidence
established that the Japanese knotweed arrived at the property as a result of
the development process, during which the defendants used loam contaminated
with knotweed rhizomes and spread it throughout the development.  The Triteses saw knotweed sprouting in their
yard shortly after they purchased their home. 
The other contaminants in their yard –- the glass and metal debris –-
were obviously also there at the time of purchase.  Because the evidence was insufficient to show
an invasion of the Triteses' property, as opposed to a preexisting
contamination, the defendants were entitled to a directed verdict in their
favor on the nuisance claim.  See
Sullivan, 487 Mass. at 72-73.
      b. 
Implied covenant of good faith and fair dealing.  The Triteses' complaint included claims for
breach of contract, breach of the warranty of habitability, and breach of the
implied covenant of good faith and fair dealing.  The breach of contract claim was based on an
express one-year limited warranty in the purchase and sale agreement, which the
Triteses contended obligated the defendants to provide a property free of
defects.[5]  The jury found for the
defendants on this claim.
      The implied warranty of habitability
"attaches to the sale of new homes by builder-vendors," Sullivan, 487
Mass. at 71, in order "to protect a purchaser of a new home from latent
defects that create substantial questions of safety and
habitability,"  id., quoting
Albrecht v. Clifford, 436 Mass. 706, 711 (2002).  This warranty "cannot be waived or
disclaimed, because to permit the disclaimer of a warranty protecting a
purchaser from the consequences of latent defects would defeat the very purpose
of the warranty."  Albrecht,
supra.  Although the parties addressed
the implied warranty of habitability in their opening statements, that claim
was not submitted to the jury for decision.[6]
      The jury did find for the Triteses on
their claim for breach of the implied covenant of good faith and fair
dealing.  The defendants argue that the
judge should have granted their motion for a directed verdict because the
implied covenant may not be invoked "to create rights and duties not
otherwise provided for in the existing contractual relationship."  Uno Restaurants, Inc. v. Boston Kenmore
Realty Corp., 441 Mass. 376, 385 (2004) (Uno). 
We agree.
      The implied covenant provides that
"neither party shall do anything that will have the effect of destroying
or injuring the right of the other party to receive the fruits of the
contract" (citation omitted). 
Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472
(1991).  It is not limited to the
enforcement of a contract's express terms; the term "implied
covenant" contemplates "an obligation that is not express in the
contract."  Classic Restaurants
Concepts, LLC v. President & Fellows of Harvard College, 104 Mass. App. Ct.
323, 331 (2024).  Nevertheless, the scope
of the implied covenant is "only as broad as the contract that governs the
particular relationship," Ayash v. Dana-Farber Cancer Inst., 443 Mass.
367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927
(2005), and a violation of the implied covenant must involve the manner in
which the contract is performed, see Ayash, supra;  Uno, 441 Mass. at 385.
      The purchase and sale agreement did not
expressly require the defendants to disclose soil contaminants, and the
Triteses do not contend that the implied covenant imposed any disclosure
obligation beyond what the contract provided.[7]  Rather, they argue that the implied covenant
required the defendants "not to knowingly bring Japanese knotweed onto the
property and not to use soil that was filled with glass, . . . hunks
of metal, garbage, and other debris that rendered the lawn unusable by the
Trites family."  Similarly, in his
G. L. c. 93A decision, the judge interpreted the jury's verdict as
finding that "the defects in the yard were so significant that [the
defendants] breached the implied covenant of good faith and fair dealing by not
mitigating those defects, thereby depriving the Triteses, as buyers, [of] the
benefits of their contract to purchase the new home."  Yet these concerns, while certainly
understandable in their own right, implicate the habitability of the property,
not whether the defendants performed their obligations under the purchase and
sale agreement in bad faith.  See Sheehy,
24 Mass. App. Ct. at 194 n.6, citing Restatement (Second) of Contracts
§ 205 (1981) (affirming summary judgment on purchaser's implied covenant
claim notwithstanding seller's alleged failure to disclose contamination of
property because implied covenant pertains only "to bad faith in the
performance of a contract").  We
decline to import habitability standards into the implied covenant of good
faith and fair dealing on the theory that buyers of property are entitled to
"the fruits of the contract." 
Anthony's Pier Four, Inc., 411 Mass. at 471-472, and cases cited.  Rather, for purchasers of new homes from
builder-vendors, their protection from latent defects lies in any warranty or
disclosure requirement set forth in the contract, the implied warranty of
habitability, and, as discussed infra, chapter 93A.[8]
      2. 
The judge's c. 93A decision and amended order.  The defendants also challenge the judge's
decision on the Triteses' parallel claims under G. L. c. 93A, §§ 2
and 9.  See Klairmont v. Gainsboro
Restaurant, Inc., 465 Mass. 165, 186 (2013).[9]
      a. 
Liability.  The defendants do not
dispute that they acted "in the conduct of any trade or commerce" for
purposes of c. 93A.  See G. L.
c. 93A, §§ 2, 11.  Although the
statute does not apply to "strictly private transactions such as the
isolated sale of a private home," Begelfer v. Najarian, 381 Mass. 177, 190
(1980), citing Lantner v. Carson, 374 Mass. 606, 610-611 (1978), its remedies
may be invoked against a construction company or real estate developer like the
defendants, see Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 622-627
(1978).  Instead, the defendants argue
that the judge's finding of unfair or deceptive conduct was erroneous because,
like the jury's finding of a violation of the implied covenant, he effectively
relied on contractual terms not set forth in the purchase and sale
agreement.  Whether particular conduct is
unfair or deceptive for purposes of a claim under G. L. c. 93A is a
question of fact that we review under the clearly erroneous standard, and
whether such unfair or deceptive conduct constitutes a c. 93A violation is
a question of law that we review de novo. 
See H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14
(2022), and cases cited.
      We disagree with the defendants' argument
that their liability under c. 93A was limited to the "terms and
obligations" of the parties' contract. 
A cause of action under c. 93A is "not dependent on
traditional tort or contract law concepts for its definition."  Heller, 376 Mass. at 626.  See H1 Lincoln, Inc, 489 Mass. at 24.  In particular, a seller of property can
violate c. 93A by failing to disclose a material fact even in the absence
of a contractual duty to disclose.  In
Heller, supra at 624-627, the Supreme Judicial Court affirmed a construction
company's liability under c. 93A for failing to disclose a drainage
problem to the purchasers of a residential property.  The court found "ample support" for
the judge's ruling that the company's failure to disclose the known defect
violated the Attorney General's consumer protection regulations.  See Heller, supra at 626-627 & n.3.  See also 940 Code Mass. Regs. § 3.16(2)
(1993) (§ 3.16[2]) ("[A]n act or practice is a violation of
[G. L.] c. 93A, § 2, if . . . [a]ny person or other
legal entity subject to this act fails to disclose to a buyer or prospective
buyer any fact[,] the disclosure of which may have influenced the buyer or
prospective buyer not to enter into the transaction").  In Sheehy –- the same case that upheld
judgment for the seller on the plaintiff's nuisance and implied covenant
claims, see supra -- the court reversed summary judgment for the seller on the
plaintiff's c. 93A claim.  See
Sheehy, 24 Mass. App. Ct. at 194-196. 
Citing the same Attorney General regulation, we explained that liability
extends to "cases of nondisclosure of a material fact."  Id. at 195. 
To recover under this theory, the plaintiff must show that
(1) "the defendants knew that the property was contaminated with
hazardous material; (2) that the contamination was a material circumstance
which would have led the plaintiff not to purchase the property; and
(3) that [the defendants] failed to disclose the problem" (footnote
omitted).  Id.
      The evidence supported the judge's finding
of a c. 93A violation here.  First,
it is clear that the Triteses would not have purchased the property had they
known about the contamination of its soil. 
Joseph Trites testified that he was distraught to learn that his yard
was infested with a plant that spreads rapidly, destroys other plants, and is
"next to impossible to get rid of." 
Further, the Triteses had to prohibit their son from playing in the
yard, due to the glass and metal debris, even though that was the main reason
they bought the property.  Second, the
evidence showed that the defendants "knew about the contamination but
failed to disclose it."  See Sheehy,
24 Mass. App. Ct. at 195.  Although a
defendant cannot be held liable under c. 93A for "not disclosing what
he does not know," id. at 196, the defendants' knowledge of the Japanese
knotweed was established by the excavator's testimony that, after he warned
Cricones not to use the contaminated pile of loam, Cricones "decided not
to worry about it."  Contrast Nei v.
Burley, 388 Mass. 307, 316-317 (1983) (no violation of § 3.16 [2] where
evidence supported finding that broker did not know lot would require
additional fill in order to construct house and septic system).  The judge also found that the defendants were
aware of the glass and metal debris based on "the sheer quantity"
that the Triteses found in their yard, and the defendants do not challenge that
finding on appeal.[10]  Finally, while a
defendant may avoid liability under c. 93A for a nondisclosure "if it
is shown that the plaintiff knew about the contamination," Sheehy, supra,
the record does not demonstrate such knowledge by the Triteses.  They bought the house before the knotweed
growing season began, and snow and hydroseed prevented them and their inspector
from detecting contaminants in the soil before purchase.[11]
      b. 
Damages.  In his c. 93A decision,
the judge concluded that the defendants caused "damages of $186,000, the
same amount of damages determined by the jury in its verdict due to nuisance
and breach of contract."[12] A claimant under G. L. c. 93A,
§ 9, may recover actual or nominal damages, whichever is greater, see
G. L. c. 93A, § 9 (3), and actual damages include recovery
"for all losses which were the foreseeable consequences of the defendant's
unfair or deceptive act or practice," DiMarzo v. American Mut. Ins. Co.,
389 Mass. 85, 101 (1983).
      The defendants argue that the evidence was
insufficient to support the award of damages. 
In assessing such evidence, we apply a "highly deferential"
standard and will overturn such an award only if it is "clearly excessive
in relation to what the plaintiff's evidence ha[d] demonstrated damages to
be."  Spinosa v. Tufts, 98 Mass.
App. Ct. 1, 10 (2020), quoting Ayash, 443 Mass. at 404.  At trial, the Triteses called a restoration
ecologist, who testified about the difficulty involved in remediating a
property infected with Japanese knotweed, and a real estate appraiser who,
based on her research, estimated that the cost of remediating the knotweed as
of 2022 resulted in a diminution in the value of the property between $65,000
and $166,000.  The Triteses also
testified about their own efforts to remove glass and metal debris from their
yard.  The defendants cross-examined
these witnesses about various remediation options, but did not present any
evidence on damages themselves. 
Considered in its totality, and with regard for the deferential standard
of review, we conclude that the evidence was sufficient to allow the judge
"to arrive at a reasonably approximate estimate of damages."  Brewster Wallcovering Co. v. Blue
Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 609 (2007).
      Conclusion.  For the foregoing reasons, we conclude that
the defendants' motion for a directed verdict should have been allowed on the
claims of nuisance and breach of the implied covenant of good faith and fair
dealing.  The judgement is otherwise
affirmed.
So ordered. 

footnotes

[1] Kim Trites.

[2] Reedy Meadow
LLC.

[3] At trial, the
Triteses also presented evidence about a fire that spread from the defendants'
property to their home.  The jury found
in favor of the defendants on the Triteses' negligence and nuisance claims as
to that fire.  The jury also found for
the defendants on two claims of intentional infliction of emotional distress.

[4] The
defendants also challenge the jury's finding of negligence.  However, because the jury also found that the
defendants' negligence did not cause the Triteses' injuries, that claim is not
a basis for the judgment entered against the defendants, and we do not address
it here.

[5]
"Acceptance of a deed ordinarily merges all obligations in the purchase
and sale agreement, except for those specified in the deed itself."  Albrecht v. Clifford, 436 Mass. 706, 716
(2002), citing McMahon v. M & D Bldrs., Inc., 360 Mass. 54, 59
(1971).  However, there is an exception
to this rule where "a purchaser from a builder-vendor [relied] on the
contractor's possessing the skill to build a house which is habitable."  Solomon v. Birger, 19 Mass. App. Ct. 634, 642
(1985).  See Kelley v. Iantosca, 78 Mass.
App. Ct. 147, 151-153 (2010) (merger no bar to action for breach of
construction contract).

[6] At the final
trial conference, the judge questioned whether the implied warranty of
habitability applies to latent defects in the yard like the soil contaminants
at issue here.  He stated that a recent
decision "basically said habitability has to involve actual use of the
residence," not a yard, but he was still inclined to present the claim to
the jury if the evidence showed that the Japanese knotweed threatened the
foundation of the Triteses' house.  In Goreham v. Martins, 485 Mass. 54
(2020), the Supreme Judicial Court held that the implied warranty of habitability
as it applies to residential leases is limited to "the physical
facilities" of the property, see id. at 65, quoting Doe, 417 Mass. at 282;
and that the warranty did not cover code violations that do not affect
"the habitability of a tenant's 'dwelling unit'" such as, in that
case, snow and ice on the driveway, Goreham, supra, quoting Doe, supra at
281.  Goreham focused on the
reasonableness of the burden imposed on landlords as the result of the strict liability
standard for personal injury damages under the implied warranty.  See Goreham, supra at 65-66.  Different considerations may apply in
determining the scope of the implied warranty of habitability as it applies to the
sale of new homes.  Cf. Berish v.
Bornstein, 437 Mass. 252, 264-265 (2002) (implied warranty as it applies to
sale of new residential condominium units by builder-vendors extends to latent
defects in common areas that implicate habitability of individual units, so as
to "ensure that there is a complete remedy for a breach of habitability in
the sale of condominium units").

[7] Nor did the
Triteses claim that the defendants engaged in common-law fraud or
misrepresentation.  See Sullivan, 487
Mass. at 73-75 (distinguishing claims for fraud and misrepresentation from
"bare nondisclosure" in real estate transactions [citation
omitted]).  Interestingly, the
"effects of Japanese [k]notweed are so drastic" that the disclosure
of its presence is now required on all sales of property in the United
Kingdom.  Rathore, The Super-Villain of
the Plant Kingdom:  Japanese Knotweed and
Its Never-Ending Saga, 18 Rutgers J.L. & Pub. Pol'y 2, 5 (2020).  No such requirement exists in Massachusetts.  Because the depth of the plant's rhizomes
makes its presence difficult to detect when dormant, prospective purchasers'
only option in the winter and early spring may be to ask sellers to disclose
whether they are aware of the plant's occupation of their property.  See Kannavos v. Annino, 356 Mass. 42, 48-49
(1969) (discussing duty of seller to disclose all known material facts when
buyer asks about conditions of property).

[8] Because the
purchase and sale agreement provided that the Triteses accepted the condition
of the property after having "an opportunity to conduct all
inspections," the Triteses might have had a claim for breach of the
implied covenant had the defendants interfered with their ability to discover
the contaminants prior to purchase.  The
home inspection that the Triteses arranged for, however, did not include a soil
analysis, and there is no evidence that the defendants placed hydroseed on the
yard in order to hamper the Triteses' and their inspector's ability to examine
the soil.

[9] The
defendants do not challenge the amount of attorney's fees and costs awarded by
the judge but, rather, the Triteses' eligibility for any relief under
c. 93A.

[10] Instead, the
defendants argue that the judge's finding of their knowledge conflicted with
his conclusion that they did not engage in a knowing or willful violation that
would warrant an award of multiple damages under c. 93A.  See H1 Lincoln, Inc., 489 Mass. at
17-18.  We disagree.  Chapter 93A distinguishes "between
violations that consist of unfair or deceptive acts or practices, simpliciter,
and those that are knowing or wilful or actuated by bad faith.  The former are sanctioned by compensatory
single damages.  Damages for the latter
more serious violations are avowedly punitive" (quotations and citation
omitted).  Gore v. Arbella Mut. Ins. Co.,
77 Mass. App. Ct. 518, 536 n.21 (2010). 
The judge reasonably concluded that even though the defendants knew
about the contaminants in the soil, they did not know that their failure to
disclose them to the Triteses amounted to unfair and deceptive conduct.

[11] The
defendants do not contend that the "as is" clause in the purchase and
sale shielded them from liability under c. 93A.  As this court recognized in Sheehy,
"Massachusetts case law rejects the assertion of 'as is' and like clauses
as an automatic defense to allegations of fraud or deceit."  Sheehy, 24 Mass. App. Ct. at 193.  It also observed that there may be
"important questions of law with respect to liability under c. 93A
for pure nondisclosure" in a case involving an "as is" agreement
and "sophisticated businessmen." 
Sheehy, supra at 196, citing V.S.H. Realty, Inc. v. Texaco, Inc., 757
F.2d 411, 420-422 (1st Cir. 1985) (Breyer, J., concurring in part and
dissenting in part).  This case, which
involves an agreement between an experienced developer and relatively
unsophisticated purchasers, does not implicate those questions.  The judge did consider the defendants'
reliance on the "as is" clause in the purchase and sale agreement as
a factor in determining that they did not engage in a knowing or willful
violation of c. 93A, and we discern no error in that analysis.

[12] The judge
was not required to adopt the jury's finding of damages.  See Wyler v. Bonnell Motors, Inc., 35 Mass.
App. Ct. 563, 567 (1993) ("a judge may make independent and, therefore,
different findings on the c. 93A aspect of a case that arises out of the
same facts which gave rise to parallel common law claims").